# CASES ARGUED AND DECIDED

# SUPREME COURT OF MISSISSIPPI,

## MARCH TERM, 1900.

---

STATE OF MISSISSIPPI, ON RELATION OF MONROE McCLURG, ATTORNEY-GENERAL, *v.* ROBERT POWELL.

1. CONSTITUTIONAL LAW. *Constitution of* 1890, *sec.* 273. *Amendments. Submission. Judicial question.*

   Whether the submission to the people of an amendment to the constitution, under sec. 273, constitution of 1890, providing therefor, be legal or illegal is a judicial question, and not a political or legislative one.

2. SAME. *Adoption.*

   Whether the people have or have not adopted a submitted amendment to the constitution, under sec. 273, constitution of 1890, providing for its amendment, is a judicial question, and not a political or legislative one.

3. SAME. *Form and manner of submission.*

   The submission of more than one proposed amendment to the constitution in such manner and form that the people cannot vote for or against each separately, is, under sec. 273, constitution of 1890, so providing, unlawful, and the court will determine whether a proposal, without reference to its form, embodies one or more amendments.

---

Statement of the case.

---

4. SAME.   *Votes necessary to adopt.*

    An amendment to the constitution, under sec. 273, constitution of 1890, making its adoption depend upon its securing the votes of a majority of the qualified electors "voting," has not been adopted if it failed to receive a majority of the votes cast, including all those voting at the election, whether they vote for or against the amendments or only for candidates for office.

5. SAME.

    If a proposed amendment to the constitution be submitted at an election at which officers are voted for, the double purpose of the election does not make it two elections; and all votes cast at the election are to be counted in determining whether the amendment be or be not adopted, the election on the amendment not being special or separable.

FROM the circuit court of Lincoln county.

HON. THOMAS BRADY, JR.,* Special Judge.

The state, on the relation of the attorney-general, appellant, was the plaintiff in the court below; Judge Robert Powell, appellee, was defendant there. The action was by quo warranto, and the information was as follows:

"The state of Mississippi, by Monroe McClurg, the attorney-general of said state, of his own accord, gives the court to understand and be informed that Robert Powell, a citizen of said state, and a resident of Madison county therein, unlawfully holds and exercises the functions of a civil public officer in said state, namely, the office of circuit judge of the seventh judicial district of said state; that he is now unlawfully holding a regular term of the circuit court for Lincoln county in said judicial district, and is unlawfully holding and exercising the functions of the judge of said court in said county; wherefore, the state of Mississippi, by the said attorney-general, prays that the said Robert Powell may be removed from the said office and debarred from exercising the functions thereof, and be ordered to deliver over all records, books and papers in his

---

*Judge Robert Powell, the regular judge of the circuit court, being a party to the suit, Mr. Brady, a member of the bar, was agreed upon by the attorneys and presided as special judge. He held the pretended constitutional amendments void, for the same reasons given by the supreme court in its opinion.

custody, or under his control, belonging to said office, and pay
the costs.                    "THE STATE OF MISSISSIPPI,
                    "BY MONROE MCCLURG,
                              *"Attorney-general."*

Judge Powell's plea was in these words, viz.:

"Now comes Robert Powell, defendant herein, and entering
his appearance to this suit he waives all defenses that could or
might be made, if any, to the information filed against him
because no claimant of the office is a relator therein; and this
he does for the reason that he is himself desirous of having,
and is interested to have, his own title to the office which he
holds and claims the right to hold, adjudged and passed upon
by the judicial department of the state government, and so
desiring he pleads in bar to said information the following
facts, viz.:   Defendant was, on the 20th day of January, 1900,
duly appointed by the governor of the state, Hon. A. H. Lon-
gino, to the office of judge of the circuit court for the seventh
circuit court district of said state, of which district and state
this defendant was then and now is a resident citizen and
qualified elector, and had been for more than five years next
preceding a practicing lawyer of this state, and had then at-
tained the age of 26 years, and possessed all the qualifications
for appointment to, accepting and holding said office, and the
said county of Lincoln is embraced in and forms a part of said
district; and defendant was so appointed for the full and com-
plete term of four years from said date; and the said appoint-
ment of this defendant to said office was at once, on said 20th
day of January, 1900, by the governor of the state submitted
to the senate, of the legislature of this state, then in session,
for confirmation or refusal to confirm, and the senate did
on January 20, 1900, confirm and approve of defend-
ant's said appointment to said office, and thereupon on the
same day notified the governor of its confirmation and ap-
proval of said appointment; and the governor thereupon, on

77 Miss.—35

said 20th day of January, 1900, issued and delivered to this defendant, and defendant accepted the same, a commission, under his, the governor's, hand and the great seal of the state, authorizing and empowering this defendant to exercise and perform all the duties and receive the emoluments of the said office for said term of four years from said date. And thereupon, in pursuance of said appointment, confirmation thereof and of said commission, this defendant did, at Jackson, Hinds county, Mississippi, on said day, January 20, 1900, before the clerk of the circuit court of Hinds county, Mississippi, said last named county being a part of and embraced in said seventh circuit court district, take and subscribe the oath of office prescribed by section 155 of the constitution of this state, adopted in 1890, which oath of office was in writing, and it was duly filed in the record of the circuit court of said Hinds county—first district thereof at Jackson—and recorded on the minutes of said last named court, then in session; and this defendant accepted said office of judge of said circuit court district, qualified as such, and then and there entered upon the discharge of the duties thereof, and has continuously since and is now performing the duties thereof, under and by virtue of said appointment, confirmation, commission and qualification aforesaid.

"Defendant further shows that the pretended amendment or amendments of the state constitution, know as the 'Noel' amendment or amendments, printed in the volume entitled 'Laws of Mississippi, 1898,' and therein denominated 'sec. 145,' did not and could not affect defendant's right to hold said office, because, he says, the concurrent resolution proposing said amendment or amendments embraced more than one, several, proposed amendments to the constitution of the state, all of which were submitted to the qualified electors of the state at one and the same time and at one and the same election, and they were not submitted in such manner and form that the people might or could vote for each amendment separately, but

they were submitted in such manner and form that the voters were compelled to vote for all of them or none, against all of them or none, or not vote at all directly either for or against any and all of them; and even when so submitted at the election held in November, 1899, they, or if but one, it, did not receive a majority of the votes of the qualified electors voting at said election; they, or if but one, it, received only 21,169 votes in the entire state, whilst there were cast for the office of governor, at said election, the full number of 48,370 votes, and there were cast against said amendment or amendments 8,643 votes. Large numbers of the qualified electors of the state who voted at said election for governor and other state, district, county, and county district officers did not vote directly either for or against the said proposed amendment or amendments, but whose votes not being for it, or them, should be counted, and should have been counted, as if voted expressly against it or them; and a majority of the electors voting at said election did not vote for the proposed changes, alterations, amendment or amendments. And the legislature of the state did not take any action or pretend in any way to insert the said proposed amendment or amendments as a part or parts of the constitution of this state until the 26th day of January, 1900, after the appointment, confirmation and commissioning of this defendant as aforesaid, and after this defendant had qualified and entered upon the discharge of the duties of the office now held by him. This the defendant is ready to verify.

"McWILLIE & THOMPSON,
"Defendant's Attorneys."

The state demurred to the plea, assigning as causes of demurrer:

"1. The plea presents no defense to the information; the facts pleaded are insufficient to bar this proceeding.

"2. The question as to the submission, adoption and insertion

of the amendment into the constitution is a legislative and not a judicial question and the legislature has passed thereon adversely to defendant's contention."

The circuit court overruled the demurrer, adjudging the plea good and valid in law; thereupon the state declined to further answer the plea, and judgment final was entered in Judge Powell's favor, from which the state appealed to the supreme court.

Section 273 of the constitution of 1890, on the subject of the amendment, is quoted in the opinion of the court.

The proposed amendments of the constitution involved were in these words:

"A CONCURRENT RESOLUTION proposing amendments to the constitution making the offices of judges of supreme and circuit courts and chancellors elective.

"*Resolved by the legislature of the state of Mississippi, two-thirds of each house agreeing thereto,* That the following amendments to the state constitution be submitted to the qualified electors of the state, for ratification or rejection, at an election to be held on Tuesday after the first Monday in November, 1899, viz.:

"Strike out the constitution sections Nos. 145, 149, 151, 152, and 153 thereof, and insert in lieu thereof the following:'

"SEC. 145.   The supreme court shall consist of three judges, any two of whom, when convened, shall form a quorum.   The legislature shall divide the state into three supreme court districts, and into convenient circuit and chancery court districts. The terms of offices of judges of circuit courts and chancellors shall be four years, and a judge of the supreme court eight years, and a judge shall be elected from each supreme and circuit court district and a chancellor from each chancery district, at a time to be fixed by the legislature, and in the same manner, as far as applicable, as provided for the election of state

officers. The legislature shall enact laws providing that the present supreme judges shall hold for their regularly appointed terms and provide that thereafter, except in elections to fill vacancies, as near one-half as practicable, of the judges of the supreme court, shall be elected at each regular judicial election, the other or others holding over; and also for filling the unexpired judicial terms. The removal of a supreme court judge to the state capital during his term of office shall not render him ineligible as his own successor for the district from which he removed. All judges and chancellors shall be elected in the same manner as provided for election of governor. All districts shall stand as now fixed till altered by law. The legislature shall provide for party nominations of judges and chancellors by districts. Sections above named are annulled from the time at which the legislature puts this amendment into operation as hereby provided. Circuit judges and chancellors may preside in any district as authorized or required by law.

"Adopted by the senate January 20, 1898.

"J. H. JONES,
"President of the senate.

"Adopted by the house January 29, 1898.

"J. F. McCOOL,
"Speaker of the house."

The resolution of the legislature claiming to insert the said amendments into the constitution was as follows:

"A CONCURRENT RESOLUTION to insert into the constitution of the state of Mississippi the amendment to the constitution making the judiciary elective.

"WHEREAS, at its session, held in 1898, the legislature of the state of Mississippi, in the manner prescribed by sec. 273 of our state constitution, passed a constitutional amendment proposing to make the judiciary of this state elective, as ·appears in the acts of 1898, pages 97 and 98, a copy of which is hereto attached; and,

"WHEREAS, in accordance with the requirements of said section, the secretary of state of Mississippi had the required public notice given of an election at which the qualified electors should vote directly for or against said amendment; and,

"WHEREAS, at said election, which was duly held throughout Mississippi, on November 7, 1899, as appears from the returns hereof, duly made to secretary of state, 21,169 votes were cast in favor of said amendment, and 8,643 votes against said amendment; therefore,

"*Be it resolved by the senate of Mississippi, the house of representatives concurring,* That said amendment be, and is hereby, inserted in the constitution of the state of Mississippi as a part of said constitution.

"Adopted by the senate January 19th, 1900.

"JAMES T. HARRISON,
"*President of the senate.*

"Adopted by the house January 26th, 1900.

"A. J. RUSSELL,
"*Speaker of the house.*"

The sections of the constitution of 1890 which the proposed amendments sought expressly to repeal are these:

"SEC. 145. The supreme court shall consist of three judges, any two of whom, when convened, shall form a quorum. The legislature shall divide the state into three supreme court districts, and the governor, by and with the advice and consent of the senate, shall appoint one judge for and from each district; but the removal of a judge to the state capital during his term of office does not render him ineligible as his own successor for the district from which he has removed. The present incumbents shall be considered as holding their terms of office from the state at large.

"SEC. 149. The term of office of the judges of the supreme court shall be nine years. The office of one of said judges shall be vacated in three years, one in six years, and one in nine

years, so that at the expiration of every three years one of said judges shall be appointed as aforesaid.

"SEC. 151.  All vacancies which may occur in said court from death, resignation or removal, shall be filled by appointment as aforesaid; but if a vacancy shall occur during the recess of the legislature, the governor shall appoint a successor, who shall hold his office until the end of the next session of the senate unless his nomination shall be sooner rejected.

"SEC. 152.  The legislature shall divide the state into convenient circuit and chancery court districts.

"SEC. 153.  The judges of the circuit courts and of the chancery courts shall be appointed by the governor, with the advice and consent of the senate, and shall hold their office for the term of four years."

The legislature passed an act (Laws 1900, p. 96) commonly called the "Cox bill," approved March 10, 1900, by which the terms of all judges of the circuit court and chancellors then in office were sought to be terminated from and after the time when (sixty days after its passage, as per sec. 75, constitution of 1890) said act was to become operative, May 10, 1900.

Judge Powell, not having recognized the said act as valid, continued to exercise the duties and functions of his office. This suit was begun May 11, 1900, to test his right thereto, and, for the benefit of those who complain of the law's delays, it may be of interest to state the case was decided in the supreme court May 30, 1900, being just nineteen days in passing through two courts to final judgment in the supreme court.

*Monroe McClurg,* attorney-general, for appellant.

Speaking through section 273 of the constitution of 1890 the sovereign has prescribed rules to be observed and followed by the legislature.  Save the single direction to the secretary of state to make the publication, the rules are all for the guidance of the legislature, and from the very nature of the thing, the legislature must be the exclusive judge of all questions to be

measured or determined by those rules; whether the question be political and certainly a legislative one, or judicial to be determined by the courts, this section of rules, not only of procedure but of final judgment as well, confides to the separate magistracy of the legislative department full power to hear, consider and adjudge that question. The legislature puts the question to the qualified electors; the qualified electors answer back to the legislature; "and if it shall appear" to the legislature that its question has been answered in the affirmative, the amendment is inserted and made part of the constitution.

The governor and the courts have no authority to speak at any stage of this proceeding between the sovereign and the legislature, and when the matter is thus concluded it is closed, and the judiciary is as powerless to interfere as the executive. Trust and confidence for good faith and correct action must rest somewhere; there is no sound reason for saying the question here involved was not properly confided to the legislature, whether it be political or not. It must be remembered that courts and legislatures are alike composed of fallible men, and that the sovereign, in the distribution of the powers of government, thoroughly understood the intellectual strength and weakness of all and had full confidence in the purity and ability of all, and so provided that, when one department was "confided to a separate magistracy" over any subject, the honest judgment, as well as the caprices of the other, should not be permitted to intervene, whatever the consequences might be. It is as fair and reasonable to suppose ignorance, or to suspect vice, in the one branch as in the other. They are not checks and safeguards against each other but equal and co-ordinate powers organized under the blessings of God to secure to the people the enjoyment of their inalienable rights to life, liberty and property. Therefore, the judiciary is not clothed with power to declare that the legislature has not followed the rules prescribed by sec. 273 of the constitution in submitting the proposition to amend, alter or change and in adjudging the

vote thereon, and for that reason strike out the amendment. The Mississippi decisions bear out this view. *Green* v. *Weller,* 32 Miss., 650; *Ib.*. 33 Miss., 735; *Ex parte Wren,* 63 Miss., 512. There is no law, constitutional or statutory, directing as to how the result of the election shall be ascertained. The concurrent resolution inserting the amendment into the constitution indicates that the legislature determined that a majority of the qualified electors voting at the election was not required; only a majority of those voting directly for or against the amendment. It also indicates that its finding is upon the report of the secretary of state. It was perfectly competent for the legislature to take this as sufficient evidence of the result, but it was not bound to do so, nor is that necessarily exclusive of all other evidence. As above argued, there was no alternative at the "next succeeding legislature" but to act. It did act and rendered a decision on the case presented; the smooth running of the process of change necessarily gave jurisdiction without provision for appeal directly or indirectly to the courts. Aside from the jurisdiction and the arbitrary judgment in virtue of it, it was the proper result under the rules of law governing the question.

It will be insisted that the words in sec. 273, "the qualified electors shall vote directly for or against such change," means, not compulsory voting, but optional, discretionary, intelligent voting. So grant; but it means further, according to our contention, to limit the decision of the result to a ballot-box count of those who expressed themselves directly by either voting for or against the amendment. It will be also insisted that the word voting in the clause, "and if it shall appear that a majority of the qualified electors voting, shall have voted for the proposed amendment," etc., is a limitation upon the qualified electors of the state; that is, a restriction of the necessary majority to a ballot-box count of the electors instead of a poll-book or registration count. Our answer to this plausible argument is that well-recognized rules of construction do not sus-

tain it. Looking to the whole section, without a period from beginning to end, the plain, logical conclusion is right along in line with that old familiar principle that obtains in all elections to the effect that those who do not vote thereby agree to abide the majority of those who do. This applies to those who voted for candidates in this election and did not vote on this question, just as it applies to those who did not vote at all. *Hawkins* v. *Carroll County,* 50 Miss., 735; *Constitutional Prohibitory Amendment,* 24 Kan., 700; *Green* v. *State* (Idaho), 47 Pac. Rep., 259.

The plea raises the question as to whether the constitution was violated in submitting more than one amendment in such form as that the electors could vote for or against each one separately. It was insisted in the circuit court, and will be here, that there was at least four separate and distinct amendments, viz.: (1) The election of supreme court judges and the change in their tenure of office; (2) the election of circuit judges; (3) the election of chancellors; (4) providing for party nominations by districts, which is to change the present laws on that subject, based upon sec. 247 of the constitution, hence an amendment of that section by a qualification thereof as to nomination of judges.

There are two conclusive answers to this objection. First, there is but one proposition stated to the electors, to agree by ballot to the election of all judges, or to signify an unwillingness to agree, by voting against it. If he favors the election of circuit judges and chancellors and opposes the appointment of supreme judges, or *vice versa,* then his proposition has never been submitted at all, and he should vote "no" on the one put. The other answer is, that one amendment means one subject, and that subject here is an elective judiciary; all else is detail and necessarily follows the change on the general subject, or, if it does not necessarily follow, may properly follow as an incident to such subject and for the purpose of carrying the subject into full effect. *State* v. *Temme,* 54 Wis., 318; *State*

v. *Morris,* 43 La. Ann., 660; *State* v. *Harriet,* 72 N. W. Rep., 93.

*E. F. Noel,* on same side.

It is not denied that more than two-thirds of each branch of the legislature of 1898, voted for the submission; nor that there were more votes cast in its favor than against it; nor that the legislature of 1900, by an almost unanimous vote, inserted this amendment in the constitution and put it into operation by a law approved by the governor, under which judges have been appointed. The question now is, can this practical construction of the adoption of the amendment, by every department of the government, be reversed and the law annulled by the courts?

This question is answered by a correct interpretation of the constitutional provisions embraced in sec. 273, which consists of but one sentence. The following well-established rule of interpretation is decisive:

"Every word employed in the constitution is to be expounded in its plain, obvious, and common sense application, unless the context furnishes some ground to control, qualify, or enlarge it. Constitutions are not designed for metaphysical or logical subtleties, for niceties of expression, for critical propriety, for elaborate shades of meaning, or for the philosophical acuteness or judicial research. They are instruments of a practical nature, founded on the common business of human life, adapted to common wants, designed for common use, and fitted for common understandings. The people make them, the people adopt them, the people must be supposed to read them, with the help of common sense, and cannot be presumed to admit in them any recondite meaning or any extraordinary law." 1 Story, Const., 451; Black on Interpretation of Laws, 28.

"Thus, it is not required that a proposed constitutional amendment be limited to a single subject, as is required of statutes, nor that the subject be expressed in its title. Indeed, no

---

---

title is necessary to a proposed amendment, and if one is inserted, it may be disregarded." 6 Am. & Eng. Enc. L. (2 ed.), 906.

The constitution of 1869 required constitutional amendments to be submitted "at (the next general) election," and not to be inserted until it appeared to have been voted for by the "majority of qualified electors, voting (for members of the legislature)," etc. In the constitution of 1890, the words in the parenthesis were omitted, and "an" substituted for "the next general."

The changes noted unmistakably indicate the purpose to leave the ratification of amendments to "an election" of its own, with no determining factors, other than there prescribed. Neither the legislature, nor any other department, can, directly or indirectly, add to or take from the terms there fixed, by making the result determinable by a vote cast before, afterwards, or contemporaneously for something else.

The insertion of amendments in the constitution is confided to the legislature according as it "shall appear" to themselves. The decision of no question of mixed law and fact, such as this, has ever been revised or annulled by any judicial department. On the contrary, the judiciary of every state of the United States, have uniformly declared that such judgment of the other co-ordinate department to which the constitution had intrusted the question, was conclusive, and its revision not within judiciary province. *Ex parte Wren,* 63 Miss., 512; *Hunt* v. *Wright,* 70 Miss., 298; *Green* v. *Weller,* 32 Miss., 650 (33 Miss., 735); *Vicksburg, etc., R. R. Co.* v. *Lowry,* 61 Miss., 102; *Luther* v. *Borden,* 7 How. (U. S.), 1; *Hawkins* v. *Governor,* 1 Ark., 570 (33 Am. Dec., 351); *Sutherland* v. *Governor,* 29 Mich., 320 (18 Am. Rep., 92); *Petition of Dennett,* 22 Maine, 603 (54 Am. Dec., 613); *Miles* v. *Bradford,* 22 Md., 184 (85 Am. Dec., 649); *Miller* v. *Johnson,* 92 Ky., 595 (15 L. R. A., 528); *Taylor* v. *Beckham,* U. S. supreme court, just decided.

The other objection raised is that several amendments were submitted in one, so that they could not be separately voted on. There is nothing in common acceptation, the dictionaries, nor the law, that gives any technical meaning to the word amendment. The fourteenth amendment contains five sections, each of great import, but it has always been held to be one amendment. All that was intended to be guarded against by the above provision was a submission of a series of amendments together, on different and unrelated matters, for in that way the whole constitution could be revised, in all its departments, by one vote for or against, and constitutional conventions forever dispensed with. All the cases hold that the different subject-matters dealt with in one amendment need not be interdependent nor indivisible; and that it is largely within legislative discretion; and that the legislature is "not compelled to submit, as separate amendments, the separate proposition necessary to accomplish a single purpose." In the Herriet case the court sustained, as one amendment, three propositions aiming at the same object, styled by the legislature as amendments 1, 2 and 3, and which was so printed on the ballot, all that to be voted for or none. *State* v. *Timme*, 54 Wis., 318; *State* v. *Mason* (La.), 9 So. Rep., 776; *State* v. *Herriet,* 10 S. D., 110.

*A. J. McLaurin,* on the same side.

Section 273 is mandatory and should be strictly construed; that it is for the judiciary to decide whether the proposal received the requisite number of votes in each branch of the legislature, and whether the legislature had acted on the submission and whether the question was judicial or political, but had no power to revise what the legislature did. The legislature had exclusive power to decide whether an amendment was necessary, what it should be and how it should be submitted, whether it had been ratified and whether it should be inserted; these were matters confided by the constitution to the wisdom, discretion and judgment of that branch of government and not

to be supervised or annulled by the judiciary. The mandate of the sovereign was directed to the legislature alone, and it alone was answerable to the sovereign as to whether the mandate had been faithfully executed. The several departments were harmonious in their equal, independent and co-ordinate powers and purposes to secure the people in the enjoyment of life, liberty and property.

In the Hayes-Tilden contest, in which the judiciary had been appealed to in a special commission to find the law, the findings of the commission were merely advisory; congress alone had power to decide the question finally and enter the judgment of the commission. The question involved is not an open one in this state (*New Orleans, etc., R. R. Co.* v. *Bailey,* 40 Miss., 452). The case of *Kochler* v. *Hill* (Iowa), relied upon by the appellee in this cause, contains only dicta on the question now before this court. This question, however, is decided for appellant in *Green* v. *Weller,* 32 Miss., 650, *Ib.* 33 Miss., 735, and *Ex parte Wren,* 63 Miss., 537. The recent case of *State* v. *Dinkins,* which will doubtlessly be reported in 77 Miss., supports the view that the courts cannot do directly what they cannot do indirectly; and the case of *Vicksburg, etc., R. R. Co.* v. *Lowry,* 61 Miss., 102, is authority for the proposition that mandamus would not issue to compel action by one department.

The judiciary have no power to decide whether the legislature has properly performed any duty or executed any power conferred by the constitution; every controversy must be determined somewhere, and when one department is designated another could not interfere. *Worman's case,* 78 Md., 21 L. R. A., 720; 24 Ala., 110; 29 Mich., 329.

"If it shall appear" means to the legislature. *Swift's case,* 69 Ind., 513; 25 N. J., 530; 69 Iowa, 563.

54 Wis., 29 Minn., 22 Minn. cases, and 6 Am. & Eng. Enc. L., 908, and other authorities cited by appellee's counsel are

clearly distinguishable from the case at bar. Cooley's Const. Lim., 52.

An analysis of sec. 273 of the constitution of 1890, in the light of all the books, the Morris lottery case, 43 La. Ann., the S. Dak. case, and the Wisconsin case especially, is conclusive of the proposition that only one amendment had been submitted. See Webster's Dictionary for definitions showing important differences in the meaning of "amendment," "change," or "alteration." Each word was put in the section for a specific purpose; there was no prohibition as to more than one "change," or "alteration." The plain language of sec. 273 directs decision on the vote for or against the proposal; any other construction would wipe the words "or against" out of the constitution.

*McWillie & Thompson,* for appellee.

Section 273 of the constitution, providing the mode and manner of its amendment, is mandatory and no change of the fundamental law is valid which is not passed in strict compliance with its terms. The question whether an amendment has been passed is necessarily a judicial one; it is judicial in its nature. To say the legislature is to pass upon it, is not only to affirm that the constitutional requirements are directory merely, and may or not be obeyed at the will of a mere quorum in each branch of the legislature, but runs counter to the fundamental conception of American constitutions. That conception is that constitutional provisions are limitations on the departments of government, and especially on the legislative department. How can a provision of the fundamental law be a limitation on the power of the legislature if the legislature can at will destroy the limitation? To so hold is to convict the constitutional convention of monumental folly; and that folly is magnified by the fact that our entire constitution breathes a distrust from its first sentence to its conclusion, a distrust especially of the legislature. The consequences of holding the

question as a legislative one are appalling. Such a question, in many instances, can only be decided by the courts or by an appeal to arms. It may be. and doubtless will be, that the incorporation of these amendments into the constitution, even if the constitution be broken to accomplish it, would not of itself produce any serious results; but if it should be done by sanctioning the principles for which our adversaries contend, a woeful precedent would be established. Revolutions in our form of government can and may be had by amendments of the constitution, and revolutions are peaceful only upon the assumption that the party opposed voluntarily surrenders its opposition. The people submit to the decisions of courts as to nothing else.

The contest between rival claimants for the presidency of the United States, less than a quarter of a century ago, teaches a wholesome lesson. There a question, confessedly a political one because made so expressly, was presented, and we all remember how utterly powerless the legislative department of the government was to deal with it. Congress stood before that question utterly appalled. In order to prevent civil war, it was driven to create the electoral commission, charged with judicial functions and powers. It by no means weakens the force of the suggestion to say that the findings of the commission were only advisory. No man who is attached to our form of government should desire the scope of judicial inquiries narrowed.

The very existence of a court presupposes an organized government; the right to try a case involves the right to decide it either way. Of course a court will not make itself a *felo de se;* when a case is presented a decision of which in a particular way involves an adjudication that the court to which it is presented is not a court at all, jurisdiction will be declined. Such cases have arisen, and in them it is not infrequently said by the judges that the question presented is political or legislative and not judicial. All of the authorities to which our adversa-

ries refer are of the character mentioned, or can be traced to dicta pronounced in such cases. Of course we except the Maryland and Maine cases referred to by opposing counsel, in each of which the constitutions under consideration provided a special tribunal, with exclusive right to determine whether amendments had been properly submitted and adopted and made the findings of such tribunals conclusive; such cases are. not in .point. The case of *Luther* v. *Borden,* 7 How. (U. S.), 1, involving the rival Rhode Island governments and Dorr's rebellion, is illustrative of appellant's authorities, other than the Maryland and Maine cases, and from its dicta the whole brood springs. No court of Rhode Island could have decided that case in the plaintiff's favor without at the same time deciding that it was not a court; and of course the federal courts in the state were bound by Rhode Island decisions touching the laws thereof. The following authorities maintain our position: *State* v. *McBride,* 4 Mo., 303; *State* v. *Swift,* 69 Ind., 505; *Collins* v. *Frierson,* 24 Ala., 108; *Westerhausen* v. *People,* 44 Mich., 265; *University* v. *McIver,* 72 N. C., 76; *State* v. *Timme* (Wis.), 2 N. W. Rep., 785; *Koehler* v. *Hill,* 60 Iowa, 543; *State* v. *Wurtz* (N. J.), 45 L. R. A., 251; *State* v. *Young,* 29 Minn., 574; *Secombe* v. *Kittleson, Ib.* 555; Jameson's Const. Con., 617; *Green* v. *Weller,* 32 Miss., 650; *Sprouls* v. *Frederich,* 69 Miss., 898. With all due respect to our adversaries, the citation of *Ex parte Wren,* 63 Miss., 537, is almost an absurdity in itself; a mere dicta is not authority.

The amendments were improperly submitted. In the face of the constitution they submit five separate amendments to be voted on as if but one—(1) The election of supreme court judges; (2) the change of the terms of the supreme court judges; (3) the election of circuit judges; (4) the election of chancellors; (5) the nomination of circuit judges and chancellors by districts, thus changing and limiting the power of the legislature under sec. 247 of the constitution.

Three cases are to be found in the books on the subject and no more, they are *State* v. *Timme,* 54 Wis., 590; *State* v. *Morris,* 43 La. Ann., 590, and *State* v. *Herriet,* 10 S. D., 109. None of them are adverse .to our contention; in fact they are in our favor, because they lay down the rule that mere incidents of the main purpose of an amendment do not· destroy its singleness, and the test, in the Wisconsin decision especially, is said to be whether if one of the constituent parts, the main one, be adopted the rejection of the others would be absurd.

The amendments did not receive the requisite number of votes; electors "voting" are those who at that election exercised the right of suffrage. The language in sec. 273, "the qualified elector shall vote," means that they shall have the right to vote and nothing more. The section affirmatively lays down a rule for determining the result, "a majority of the qualified electors voting." If you strike out the word "voting," which you can· not rightfully do, it would require either a majority of the entire electors in the state, or else a majority of those directly voting on the amendment. Take the latter, and the appellant's contention gives no effect to the word "voting;" but is must be given some meaning. It is either a limitation on all the qualified electors in the state, and if so, the limitation cannot be enlarged, or it is an enlargement of those voting on the amendment and as such it cannot be restricted by construction. Surely it cannot be said that an elector who went to the polls and voted for governor and other state and county officers is not of those "voting" at the election. *State* v. *Foraker,* 46 Ohio, 692; *State* v. *McGowan,* 138 Mo., 193; *State* v. *Swift,* 69 Ind., 505; *Stebbins' case,* 108 Mich.; *Bayard* v. *Klinge,* 16 Minn., 252; *Bank* v. *Saunders,* 51 Neb., 801.

*Frank Johnston,* on same side.

1. The amendment proposed is not in the form prescribed by sec. 273 of the constitution, being submitted as one amendment,

while it should have been submitted in the form of several amendments, so that the different changes proposed could have been voted on separately by the people at the election.

The distinct and independent changes proposed are, the election of supreme court judges, the election of chancellors, the election of circuit judges, a change in the terms of the supreme court judges, and the subject of party nominations of candidates for these several offices. These subjects are distinct and independent and are not interdependent the one upon the other.

2. Section 273 of the constitution requires that an amendment, to be adopted, must receive a majority of all the votes cast at the election, and not merely a majority of the votes of the electors who voted on the question of the amendment.

The terms of this provision of the constitution are broad enough to include all of the electors voting at the election, and in order to give it a more restricted meaning resort must be had to construction by implication, involving the necessity of interpolation.

3. The construction and application of sec. 273 of the constitution is not one that has been confided exclusively to the legislature. This is a judicial question, for the ultimate decisions of the courts. It is for the courts to finally determine the question whether a constitutional amendment has been adopted in accordance with the requirements of the constitution. *Spangler* v. *Jacoby,* 14 Ill., 297; *Miller* v. *Martin,* 70 Ill., 695; *Miller* v. *State,* 3 Ohio (N. S.), 475; *State* v. *Moffit,* 5 Ohio, 358; *People* v. *Mahany,* 13 Mich., 481; *Southhauk* v. *Commonwealth,* 2 Pa. St., 446; *McCullouch* v. *State,* 11 Ind., 420; *Berry* v. *Railroad Co.,* 41 Ind., 446; *People* v. *Chenango,* 8 N. Y., 317; *Fordyce* v. *Goodman,* 20 N. S., 1; *State* v. *Platt,* 2 S. C. (N. S.), 150; *Jones* v. *Hutchinson,* 43 Ala., 72; *Moody* v. *State,* 48 Ala., 115; Opinion of Justices, 35 N. H., 579; *Osborn* v. *State,* 5 W. Va., 85; *Smithie* v. *Garth,* 33 Ark., 17; *Fowler* v. *Pierce,* 2 Col., 165.

*J. A. P. Campbell,* on same side.

1. The question is a judicial one, and the court is not concluded by the action of the legislature. Not an open question in Mississippi? *Green* v. *Weller,* 32 Miss., 650, and *Sproule* v. *Frederick,* 69 Miss., 898.

Were it open, the cases elsewhere are numerous in affirmation of the right and duty of the court to deal with it. 24 Ala., 100; 102 Cal., 113; 60 Iowa, 543; 69 Ind., 505; 15 L. R. A., 524 (Ky.); 45 L. R. A., 251 (N.J.); 44 Mich., 265; 29 Minn., 555; 4 Mo., 305; 72 N. C., 76; 144 U. S., 1; 146 Ind., 1. And every case on what vote is necessary, is an affirmation · of the propriety of deciding the question.

2. What vote is required of the electors to adopt an amendment: 6 Neb., 474; 17 Ind., 188; 22 Ind., 158; 25 Ind., 864; 26 Ind., 517; 51 Ind., 801; 102 Cal., 298; 46 Ohio St., 677; 48 Ill., 263; 35 Mo., 103; 73 Ind., 435; 95 Ind., 44; 5 Heis., 294; 16 Minn., 53; Ind., 249; 50 Miss., 735; 24 Kan., 700, illustrate the distinction between voting on amendments and voting at an election. 46 Ohio St., 677, meets the fallacy that the vote on the amendments is a separate election.

3. The amendments are plural and were submitted as one, when they should have been separated. 43 L. R. A., 590; 54 Wis., 318; 10 S. D., 109.

*Hiram Cassedy, Jr.,* on the same side.

Mr. Cassedy's brief was purposely limited to a discussion of the want of applicability of the election laws of the state to an election upon an amendment to the constitution. He contended that the election in November, 1899, on the "Noel" amendments was nonofficial and void. As the supreme court did not pass upon the question so argued, a synopsis of the brief is not given.

Argued orally by *Monroe McClurg,* attorney-general, *E. F. Noel* and *A. J. McLaurin,* for appellant, and by *R. H. Thompson, Frank Johnston* and *J. A. P. Campbell,* for appellee.

WHITFIELD, C. J., delivered the opinion of the court.

Three questions are presented for solution.

First, is the question whether the proposition submitted to the voters for adoption as part of the constitution be one amendment or more than one amendment, a judicial question? and, likewise, is the question whether such proposition received the majority prescribed by the constitution as essential to its valid adoption, a judicial question?

Second, if these questions are judicial questions, was the proposition one amendment, or two or more amendments, and as necessarily involved herein, was the proposition submitted in the way the constitution imperatively requires it to be submitted?

Third, was the proposition adopted by the majority of qualified electors prescribed by the constitution as essential to the adoption of an amendment thereto?

As to the first proposition, we are clear that both questions are judicial questions. This is placed beyond cavil, as the settled doctrine of this state, by *Green* v. *Weller,* 32 Miss., and *Sproule* v. *Frederick,* 69 Miss., 898. The same response is given by an overwhelming weight of authority from other states. In the 6th vol. of Am. & Eng. Enc. L., at page 908, second edition, it is said:

"The courts have full power to declare that an amendment to the constitution has not been properly adopted even though it has been so declared by the political department of the state," and for this statement the following authorities are cited: *Collier* v. *Fruison,* 24 Ala., 100; *State* v. *Swift,* 69 Ind., 505; *Koehler* v. *Hill,* 60 Iowa, 543; *State* v. *Young,* 29 Minn., 574; *Secombe* v. *Kittleson,* 29 Minn., 555; *State* v. *McBride,* 4 Mo., 505; *State* v. *Timme,* 54 Wis., 318; Jameson's Const. Conventions, 4th edition, 617. We have carefully examined each of these authorities, and they clearly and fully support the statement of the text, the case from Missouri being es-

pecially emphatic, as is also the case from Alabama.   In this last case, the court says:

"We entertain no doubt, that, to change the constitution in any other mode than by a convention, every requisition demanded by the instrument itself must be observed, and the omission of any one is fatal to the amendment.   The constitution is the supreme and paramount law.   The mode by which amendments are to be made under it are clearly defined.   It has been said that certain acts are to be done, certain requisitions are to be observed, before a change can be effected.   But to what purpose are those acts required or these requisitions enjoined, if the legislature, or any other department of the government, can dispense with them?   To do so would be to violate the instrument which they are sworn to support; and every principle of public law and sound constitutional policy requires the court to pronounce against every amendment which is shown not to have been made in accordance with the rules prescribed by the fundamental law." .

The learned editors of L. R. A., in the note to *Miller* v. *Johnson,* vol. 15, page 524, expressly say "that the question of lawful adoption of an amendment to the constitution is a judicial question."

Judge Handy and Chief Justice Smith clearly treat the question as a judicial question in *Green* v. *Weller,* and language could hardly be clearer or stronger in support of this view, than is that of Chief Justice Smith in that case.   All that is said in *Ex parte Wren,* 63 Miss., page 512, on this subject is pure dictum, the question not being before the court.   The true view is that the constitution, the organic law of the land, is paramount and supreme over governor, legislature and courts. When it prescribes the exact method in which an amendment shall be submitted, and defines positively the majority necessary to its adoption, these are constitutional directions mandatory upon all departments of the government and without strict compliance with which no amendment can be validly

adopted.  Whether an amendment has been validly submitted or validly adopted depends upon the fact of compliance or non-compliance with the constitutional directions as to how such amendments shall be submitted and adopted; and whether such compliance . has, in fact, been had, must, in the nature of the case, be a judicial question.  It may be, that, where the constitution creates a special tribunal and confides to that tribunal the exclusive power to canvass the votes and declare the result and make the amendment part of the constitution as a result of such declaration, by a proclamation, or otherwise prescribed method fixed for such tribunal by the constitution, then the action of such special tribunal would be final and conclusive whether its action be judicial or not.  This is so because it was competent for the sovereign people, speaking through their constitution, so to provide.  Such provision was made in Maryland and Maine, and the three cases cited from those states rest expressly upon the fact that the constitution did so establish such special constitutional tribunal clothed with exclusive power in the premises.

In Bennett's case, 54 Am. Dec., 602 (32 Me., 508), it was made the exclusive duty of the governor and council to open and compare votes returned, and the effort was, the governor and counsel declining to do so, to compel them, by mandamus, so to do.  So in *Miles* v. *Badford*, 22 Md., 170, it appears at page 183 that the 8th section of the act under review required the returns of the votes on the adoption or rejection of a constitution to be made to the governor, and it was made his duty to count the vote and ascertain the result, and by his proclamation to the people of the state, finally declare the fact whether the constitution had been adopted or not.  In this case also the effort was made, by mandamus, to control the discretion of the executive, as is seen from the opinion in chief at page 185 and from the concurring opinion of Bartol, J., at page 186.  In both of these cases, the court, of course, held that it was not competent for the court by mandamus to compel the executive to act, or to

direct him in what mode his discretion should be exercised, in the matter intrusted exclusively to him. It is to be noted that Bartol, J., in the last case cited, thought the action of the governor, under that particular statute even, was subject to review.

So in *Worman* v. *Haggan*, 78 Maryland, at page 164, it is shown that it was made the duty of the governor to make publication of the bills which propose amendments to the constitution, and the votes cast for and against the amendments were to be returned to him; and it was then provided that, if it should appear to him, the governor, that a majority had voted in favor of the amendment, he should, by his proclamation, declare that the amendment had been adopted by the people, and it was expressly provided that thenceforth it should become a part of the constitution. It is perfectly obvious that the provisions of the Maine and Maryland constitutions are wholly unlike sec. 273 of the constitution of 1890. Those constitutions did create the governor and council in one and the governor in the other, a special tribunal to count the vote, canvass the returns, declare the result, and, upon its appearing to such tribunal that a majority did vote for the amendment, so to declare by a proclamation to the people.

Another case referred to is *State* v. *Barnes*, 3 N. D., page 323. But it is manifest from reading pages 323-4 (bottom of one and top of other), that section 8 of the enabling act there required a separate vote on the amendments to the constitution, and that the facts as to that vote should be shown to the president of the United States, with a statement of the votes for and against the constitution and each specific proposition so separately submitted, and that the president from these data was required to determine whether or not the constitution was republican in form, and whether or not the requirements of the enabling act had been complied with; and, if so, he was further required to issue his proclamation admitting the state as a state into the union. Here, again, the matter was confined to

the president, the act conferring upon him exclusive power in the premises.

Counsel mistakes the case of *State* v. *Swift,* 69 Ind., as can be seen from page 513 of the report. He says that the court did not go into the question, but held that the governor having issued his proclamation, the matter was *res adjudicata.* What the court said was *res adjudicata,* at page 513, was the action of the governor and secretary of state under an act of the general assembly of 1873, not the matter then before the court, into which last matter the court did examine, treating it as a judicial question manifestly.

Our constitutional provisions create no special tribunal to determine whether amendments have been validly submitted or validly adopted. It is not said that "if it appear" to the legislature, upon which erroneous assumption is builded the argument counter to our view. Plainly and manifestly the language, "if it shall appear," means simply, if it should be made manifest, or evident; if it should be the fact that, etc.; but whether it is a fact is a judicial question determinable by the courts.

The case of *Luther* v. *Borden,* 7 How. (U. S.), 1, so much relied upon by counsel, was a case of two opposing governments, each claiming to be lawful, and it was said in that case that if a state court should come to the conclusion that the government under which it acted had been put aside and displaced by an opposing government, it would cease to be a court, and be incapable of pronouncing a judicial decision upon the question. Here there is no question of opposing government, or as to whether this court exists so as to be able to pronounce a judgment, and the case of *Luther* v. *Borden* is of no aid in the solution of this case on its facts. See note, page 524, vol. 15, L. R. A.

The constitution can be amended in but two ways—by the people assembled in a constitutional convention, or by observing the constitutional method marked out in section 273 of the

constitution .of 1890. When the latter mode of amending the constitution is sought to be followed, the conditions upon which alone the amendment can become a part of the constitution are precisely described in said section 273. It is the mandate of the constitution itself, the paramount and supreme law of the land, that such amendment cannot become part of the constitution unless two facts existed: First, unless such amendment or amendments should be submitted in the mode pointed out; second, unless such amendment or amendments should be adopted by the majority prescribed. These two conditions are facts which must exist, in truth and in reality, and not simply be declared to exist by the legislature, whether they do exist or not. The legislature is not given the power, as a special tribunal, to count the votes, canvass the returns, declare the result, and make the amendment part of the constitution by proclamation. All that it does, all that it can do, is, in the first instance, to propose the amendment, or amendments, to the people for their vote in the way the constitution directs. It is for the people, and the people alone, to say, by the majority prescribed in the constitution, whether they adopt or reject the proposed amendment or amendments. Amendments which are adopted owe their vitality to the action of the people primarily, that action to be had in accordance with the method prescribed in section 273. The legislature simply proposes an amendment in the first instance, and that is absolutely all that that legislature has to do with the matter. The people then act, and the next succeeding legislature—not the next session of the legislature proposing the amendment—is authorized to insert the amendment as a part of the constitution, if the former legislature shall have validly submitted it, and the people have validly adopted it. The legislature, in what it has to do, acts ministerially as the agent of the people, through the provisions of section 273, in first proposing, and afterwards inserting, the amendment; but the people cannot vote effectually upon an amendment unless it shall have been sub-

mitted in the mode pointed out, and the vital things are the existence of the facts named—submission in conformity with section 273 and adoption by the majority therein prescribed—upon which facts or conditions the vitality of the amendment itself, its right legally to be written and inserted into the constitution, depends.

The best considered case we have seen on this subject is *State* v. *Wurts* (N. J.), reported in 45 L. R. A., p. 251. Speaking of the proposition that the question here is not a judicial question, the court say: "That such a proposition is not true, seems to be indicated by the whole history of jurisprudence in this country." The court then reviews numerous decisions, all of which have been cited in the argument here, properly distinguishing *Worman* v. *Haggan*. 78 Md., 152, s.c. 21 L. R. A., 716.

·The court says with great force: "If a legislative enactment which may be repealed in a year, or an executive act which affects only a single individual, cannot be allowed to stand, if it contravenes the constitution, *a fortiori* a change in the fundamental law, which is much more permanent and affects the whole community, should not be permitted to take place, in violation of constitutional mandates."

Chief Justice Beasley put the pith of the whole matter in one sentence, saying, in *State* v. *Rogers*, 56 N. J. L., 480, 619: "When the inquiry is whether the legislature, or any other body or officer, has violated the regulations of the constitution, it is entirely plain that the decision of that subject must rest exclusively with the judicial department of the government." This is the whole of it, resulting from the supremacy of the constitution as the paramount law of the land—supreme over all departments of the government.

As to the second proposition. We are satisfied that the proposition submitted to the voters contained at least four separate amendments. The sections proposed to be repealed, to wit, sections 145, 149, 151, 152 and 153, relate to separate matters.

Section 145 deals alone with the supreme court, as does said section 149. Section 153 deals with the judges of the circuit courts and of the chancery courts. Section 151 deals with the method of filling vacancies in the supreme court. Section 152 deals with circuit and chancery districts. It will thus be seen that the sections of the constitution of 1890 sought to be repealed treat separately of the supreme court and supreme court judges and of the judges of the circuit and chancery courts. Section 177, relating to vacancies in the office of circuit judges or chancellors and the method of filling them where the vacancy occurs during the recess of the senate, was wholly overlooked by the proposed amendments. It might well be that many voters might have been willing to vote for the election of circuit judges and chancellors who would be unwilling to vote for the election of supreme judges; and that many voters might have been willing to vote for the election of all judges, and yet wholly unwilling to vote for party nominations by districts, of judges to be voted for over the whole state. Whether an amendment is one or many clearly must depend upon the nature of the subject-matter covered by the amendment. If the propositions are separate, one in no manner dependent upon the other, so that a voter may intelligently vote for one and against the other, one being able to stand alone, disconnected wholly from the others, then such amendments are many and not one, are severable and not a unit, are complete each in itself and not each a part of an interdependent scheme; and such, manifestly, are the amendments in this case. A voter might have chosen to vote for the election of circuit judges and not for the election of chancellors; and one may have chosen to vote for the election of both circuit judges and chancellors, and yet, not for the election of supreme judges; one might have been willing to vote for the election of all judges, and yet not willing to sanction, by his vote, a scheme for party nomination by districts, for judges to be voted for by electors of the entire state, such as proposed in these amendments. And an elector might

have exercised his choice between these four amendments, voting for one or more and against one or more, and one amendment as to the election of circuit judges or chancellors or supreme judges, might have been adopted and the others rejected, and our constitutional scheme remained perfectly symmetrical and harmonious. And so the people could have adopted the amendments providing for the election of all judges, and rejected the scheme propounded for party nominations by districts, and such action would have been perfectly intelligent, and these three amendments could have been written into the constitution without the other, which is not essential to any one of the three amendments. The argument is wholly fallacious which seeks to save this method of submission, by saying that all of the amendments relate to the judicial department of the government. If that argument were correct, then the mere fact that amendments, no matter how many, and no matter how absolutely independent each of the other, relating to the legislative department, could all be submitted as one; and so as to the judicial department, and so as to the executive department. Whether amendments are one or many must be solved by their inherent nature, by the consideration whether they are separate and independent each of the other so as that each can stand alone without the other, leaving the constitutional scheme symmetrical, harmonious and independent on the subject; and not upon the mere blanketing of a name, such as "amendments relating to the judicial department" or "amendments relating to the executive department" or "to the legislative department." Nothing could save these amendments unless it be that the fact that they relate to the same general, broad subject of the judicial department could save them, and this is utterly in the face of reason and principle.

Three cases are cited by counsel as showing the oneness of this alleged amendment—*State* v. *Timme,* 54 Wis., 318; *State*

v. *Herriet,* 10 So. Dak., 120; *State* v. *Morris,* 43 La. Ann., 590.

In the Wisconsin case, at page 336, the court says: "In order to constitute more than one amendment, the proposition submitted must relate to more than one subject, and have at least two distinct and separate purposes not dependent upon or connected with each other. Tested by this rule, the propositions submitted to the electors contained but one amendment. The purpose there, as stated, was to change from annual to biennial sessions of the legislature; and, incidental and dependent upon this, was the proposition to change the tenure of office of members of the assembly from one to two years, and to change the composition of the members. The court said: "If they must be submitted separately, why must they? Certainly they should either both be defeated or both adopted. Why, then, should the people be permitted or compelled to vote upon each separately?" This conclusion shows that that court itself would have held, where the amendments were not such that all would have to be defeated or all adopted, that they were separate amendments; but it is further to be noticed, in that case, that great stress was laid upon the fact that all the departments of government had for a long period of time construed the question of the adoption of such amendments as the court construed it in that case. Here, there has been no such uniform action of the departments of government.

In the South Dakota case it is perfectly manifest that the proposed amendment was but one amendment. It abolished certain trustees of the university, and established one board of control for all educational institutions of the state supported by state taxation; it was clearly a single proposition, which stood or fell as an entirety, and yet, even in that case, the supreme court hesitated before declaring it one amendment.

In the Louisiana case the proposition was to charter a lottery, upon its paying, as consideration for being chartered, to various charitable institutions, named sums of money. There

were a great many incidental provisions and regulations aux-
iliary to the great controlling scheme, to wit, the establishment
of a lottery, all of which were manifestly only auxiliary and
adjuratory of the proposition of the establishment of a lottery.
The decision is manifestly correct—the whole scheme stood
or fell together, and was manifestly one in design and purpose.
These authorities, therefore, are of no value in the determina-
tion of the question whether the proposition here submitted
to our voters embraced one amendment or more than one amend-
ment.

The question whether, there being several amendments, they
were submitted so that the voters could vote separately on each,
was fundamentally vital. Says the supreme court of Califor-
nia, *Oakland* v. *Hilton,* 69 Cal., 489: "When a mode is thus
established and ordained, it must be followed. The people of
a state may impose a limit upon their own power, and when
this is done by the constitution, it must be regarded as much
a portion of the paramount law, and as obligatory on the
whole people, as any other portion of the whole constitution.
If we do not so hold, we would sanction revolution and violence,
and place lawlessness on a level with law. The majority of
the people, according to law, having adopted the constitution
with a mode of amendment in it, we must regard it as a solemn
declaration to the minority in the state, as binding as a com-
pact with such minority, that the majority, however large or
overwhelming, will never exercise its irresistible power, its
vis major, to change the law of its organization as a government
in any other way. We hold it to be sound law that a consti-
tution adopted as was the present constitution of the state of
California, is not lawfully changed by the vote of every elector
in the state, unless in the mode provided in it. The majority
in favor of the change may be so irresistible, in its physical
power, as to command the forced acquiescence or unwilling con-
sent of an inconsiderable minority; but nevertheless a change
of the constitution so brought about, contrary to its provisions,

would be lawless, revolutionary, and unconstitutional; and it would be the duty of this court, in obedience to the oath which its members have taken, so to declare it, in favor of any litigant who should invoke its judgment, in the course of regular procedure, though the sole litigant invoking its aid and power should constitute the nonconsenting minority. If they did not so declare, the organic law would not afford that protection and refuge which it was intended to afford." See, also, what is said in this case at pages 502-3.

The necessity for greater deliberation and strictness of procedure in respect to the adoption of constitutional amendments than that which applies to the passage of acts of the legislature, is pointed out, with great clearness, in *State* v. *Foraker,* 46 Ohio St. Rep.

See, also, what is said by Justice Brewer in the prohibitory amendment cases, 24 Kan., at page 712. Judge Brewer very strongly says, speaking of the part that the legislature plays when the constitutional requirements have not been obeyed: "It lacks the sanction of law, is a disregard of constitutional methods and limitations, and should be taken as a request for a change rather than as a change itself. But notwithstanding this, legislative action is simply a determination to submit the question to popular decision. It is in no sense final. No number of legislatures, and no amount of legislative action, can change the fundamental law. This was made by the people, who alone can change it. The action of the legislature in respect to constitutional change is something like the action of a committee of the legislature in respect to the disposition of a legislative bill. It presents it, recommends, but it does not decide. It is the legislative action which is considered in determining whether the law has been constitutionally passed, and it is the popular action which is to be principally considered in determining whether a constitutional amendment has been adopted."

We therefore hold, and so declare, that there were at least

four amendments submitted to the people in this proposition, and that for that reason the amendments were not submitted in accordance with section 273 of the constitution, and, notwithstanding the action of the legislature in inserting them in the constitution, are null and void, and form no part of said constitution.

On the third proposition we are satisfied that the majority required by section 273 of the constitution of 1890 for the adoption of a constitutional amendment, must be a majority of all the electors voting at the election, not simply all voting on the adoption or rejection of the constitutional amendments submitted. A consideration of the history of section 273 in our constitution demonstrates this beyond all controversy. In the constitution of 1817, found in Hutchinson's code, page 35, this provision reads, as to this point: "If it shall appear that a majority of the citizens of the state voting for representatives, have voted for a convention," etc. In the constitution of 1832, Hutchinson's code, page 51, as to this point, the section reads: "Public notice thereof shall then be given by the secretary of state at least six months preceding the next general election, at which the qualified electors shall vote directly for or against such change, alteration or amendment; and if it shall appear that a majority of the qualified electors voting for members of the legislature, shall have voted for the proposed change, alteration or amendment, then it shall be inserted by the next succeeding legislature as a part of this constitution, and not otherwise." Note the language, "and not otherwise."

The constitution of 1869, code of 1871, 667, art. 13, as to this point reads: "If it shall appear that a majority of the qualified electors voting for members of the legislature shall have voted for the proposed amendments," etc.

The constitution of 1890, section 273, reads: "Whenever two-thirds of each house of the legislature shall deem a change,

alteration or amendment necessary to this constitution, such proposed change, alteration or amendment shall be read and passed by a two-thirds vote of each house, respectively, on each day, for three successive days; public notice shall then be given by the secretary of state at least three months preceding an election, at which the qualified electors shall vote directly for or against such change, alteration or amendment; and if more than one amendment shall be submitted at one time, they shall be submitted in such manner and form that the people may vote for or against each amendment separately; and if it shall appear that a majority of the qualified electors voting shall have voted for the proposed change, alteration or amendment, then it shall be inserted by the next succeeding legislature, as a part of this constitution, and not otherwise.

It will be noticed that the constitution of 1890 omits after the word voting the words "for members of the legislature;" and the enrolled section of the constitution, in the secretary of state's office, shows that there should be a comma after the word "voting" in section 273 as it now stands. The significant fact thus stands out, like a mountain in the landscape, that for the whole period of time from 1817 to 1890, the constitution of the state having been four times changed during such period, a period of seventy-three years of state history, the people of this state, speaking through their sovereign instrument, the constitution, had uniformly declared that no majority of electors less than a majority of those voting for members of the legislature (which election would bring out, it was presumed, the largest number of electors), should avail to change the organic law of the land. That law reaches with its protection every one in the state. Unlike an act of the legislature, which may or may not be general, its effectiveness is universal, its potency reaches in its power the territorial limits of the whole state and protects all rights of life, liberty and property thereunder. This charter of our liberties, this ark of the covenant, the people for seventy-three years had said should not be

touched lightly or carelessly changed. That law expressly provided that such change could be effected only by a vote of a majority of all votes for members of the legislature. How did this clause "for members of the legislature" come to be dropped? It was dropped simply and only because sessions of the legislature were then, and thereafter to be, quadrennial. In view of this fact, the framers of the constitution wisely foresaw that if one legislature had to propose an amendment and the succeeding legislature had to insert it, that if a constitutional amendment could only be submitted when members of the legislature were to be voted for, there would result a positive inhibition of an election on the question of adopting a constitutional amendment except at intervals of at least every four years; and it might very likely occur that a period of eight years might intervene between the submission of an amendment and its insertion in the constitution. That so long a period of time should be allowed to stand in the way of a demand for a change in the constitution made exigent by some great public necessity, was wholly unreasonable. It might be that a constitutional amendment ought to be submitted at a special election, held for that purpose only. The public necessity might be such that, not waiting for a special election, such amendment should be submitted at some regular election for state officers, or at a congressional election. The time for holding an election on the question of adopting a constitutional amendment was not vital. The majority by which the public policy of the state had always declared such amendments could alone be adopted was vital. Time could be fixed to suit the convenience of the voters. The great fundamental condition, the requisite majority, was to remain essentially unaltered. It would be imputing to the wise framers of the constitution of 1890 the greatest folly to suppose that they meant to reverse the policy of this state for seventy odd years, as to the majority necessary to adopt a constitutional amendment, when the real purpose of the omission of the words "for members of the leg-

islature" lies on the very surface of the investigation, and was
manifestly, as stated, the result alone of the fact that the elec-
tion of members of the legislature was made quadrennial.  If
an election should be held to determine alone whether the con-
stitution should be amended or not, a majority of the electors
voting would, in such case, necessarily be a majority of those
voting for or against the adoption of the amendment.  Clearly,
therefore, this consideration in nowise affects the soundness of
our holding that, whether the vote on a constitutional amend-
ment occurs on a day when state officers are also voted for, there
must be a majority of all the electors voting that day for any-
thing, to make the adoption of the amendment valid, as is ex-
pressly held in *Stebbins* v. *Judge,* 108 Mich., 698.

The court said: "We see nothing absurd in the legislature
providing that at a special election a majority of the votes
should control, while at a general election a majority of all
the votes cast at the election should control.  There might have
been in the legislative mind the very best of reasons for such
provisions."

Nothing is gained by referring to the words "an election at
which the qualified electors shall vote directly for or against
such amendment."  The very same words, "directly for or
against such amendment," occur in the same provision in the
constitutions of 1869 and 1832.  Nor do the words "an elec-
tion" mean, as alleged, a special election.  If that construction
were correct, then every constitutional amendment would, nec-
essarily, have to be submitted at some special election called for
that purpose alone; yet for seventy odd years the policy of the
state had been exactly the reverse.  That policy of the state
was never to submit a constitutional amendment except at an
election for members of the legislature, for the reason that,
at such elections for members of the legislature, the fullest
possible vote would be polled.

The constitution framers of 1817, 1832, and 1869 correctly
thought that the best way to secure a full vote was not by sub-

mitting an abstract proposition for a .change in the organic law at a special election, but at an election when friends, or others in whom voters might be interested, as candidates for the legislature, should be chosen. This was an eminently wise and common sense view founded on good reason. "An election" simply means any election, whether it be a special election, or a regular election for state officers, or a congressional election. Electors voted "directly for or against an amendment" under the constitutions of 1832 and 1869. Also the dropping of the words "the next general" before the word "election" from section 273 of the constitution, and the substituting for these words "an election" was made necessary solely because of the fact that elections of members of the legislature were made quadrennial. Prior to the constitution of 1890, the electors would vote at an election, "directly for or against," and it then required a majority of the qualified electors voting for members of the legislature, at that general election, to adopt the amendment. Now qualified voters at an election, special or general, at which they vote, vote directly for or against "such amendment," but it requires a majority of all the qualified electors voting at that election, whether special or general, no matter for what officers or for what things or propositions they may vote. The number to be ascertained—so as to find what a majority of that number was—is the number of all the qualified electors who vote at the election, who vote at that election no matter for what they vote, keeping up the uniform policy of this provision of the constitution. This constitution provides that not simply a majority of the qualified electors voting for members of the legislature should be required, but that a majority of all the qualified electors voting that day, at that election, special or general, should be required. This might require a larger number of voters to adopt a constitutional amendment than would constitute a majority of the electors voting for members of the legislature. It cannot require less than such a majority. So that it is perfectly obvious, that the policy of this state through all the days of

statehood was under the constitution of 1890 not only main-
tained but absolutely strengthened.  It is not enough now that
a majority of electors voting for legislators shall vote for the
amendment.  The adoption of such an amendment requires a
majority of all the qualified electors voting for any purpose
whatever.  This construction preserves the policy the state man-
ifested by these provisions in three constitutions by universal
usage before and since the war, and conserves the great prin-
ciple which imperatively demands that the great organic law of
the state, its constitution, supreme and paramount over every
interest, shall never be altered or changed, except upon the ma-
turest judgment, and by a majority sufficient to warrant the con-
viction that the change has met the approval of intelligent free-
men.

Such is the view deduced from a history of this section, the
public policy of the state as declared by this section in its vari-
ous forms, in the different constitutions, from 1817 to 1890,
and from the construction of the several clauses of sec. 273
itself.  It may be added that this would be entirely sufficient to
dispose of the case, since it is admitted that these amendments
did not receive a majority of all the qualified electors voting at
the election.  Little aid can be gathered from the decisions of
other states construing their particular clauses in their constitu-
tions providing for amendments to their constitutions, little
aid, that is, of direct authority, since a decision from another
state would only be persuasive authority, even where it was ren-
dered in construction of a clause or clauses in its constitution
identical with like clause or clauses of our constitution.  But
the overwhelming weight of authority adopts our view on this
proposition also.  In the case of prohibitory amendments, 24
Kan., 707, the clause is, "If a majority of electors voting on
said amendments," etc.  Of course there was no room for doubt
on that sort of a clause, that only a "majority of electors vot-
ing on said amendments" was required.  There are many cases
of propositions to remove courthouses and change county sites,

to get franchises, and to vote bonds, etc., as to which there have been many conflicting decisions. Such decisions are of very little value in the solution of this question.

State v. Langlie, 5 N. Dak., 504, was a county site case; State v. Grace, 20 Oregon, 161, was another county site case. It is to be remarked that both of these cases quote Gillespie v. Palmer, 20 Wis., 573, a case thoroughly repudiated by many courts and of no authority. See specially the criticism of this case in Stebbin's case, 108 Mich., 695, in which it is shown that it has been overruled in Wisconsin (45 Wis., 279) Chief Justice Ryan characterizing it as "a reproach, and a judgment proceeding upon policy rather than upon principle."

The case of State v. Barnes, 3 N. Dak., 319, goes upon the fact that the vote upon the constitutional amendment was by the provision of law therein controlling, made a wholly separate and special election, though occurring on the same day with an election for officers. Being made a special election, of course a majority of electors voting on the question of adopting the constitution would control.

The case of Marion County v. Winkley, 29 Kan., 40, is purely a local case about a hedge bounty submitted to the people of a county. The distinction between a local election and this sort of a state election on the adoption of a constitution, is too obvious for comment.

Our view as to the majority required for the valid adoption of a constitutional amendment is directly and clearly supported by the following cases: State v. Foraker, 46 Ohio, 692; State v. McGowen, 138 Mo., 193; State v. Swift, 69 Ind., 505; Bank v. Saunders, 51 Neb., 801; Bayard v. Klinge, 16 Minn., 252; Stebbins v. Case, 108 Mich., 693, and many others in briefs of counsel.

In the Nebraska case it was held that it required a majority of the highest aggregate number of votes cast, whether for an officer or for an amendment.

In State v. Swift, 69 Ind., 520, the distinction was pointed

out between the reasons for requiring a different majority to elect an officer and to adopt a constitutional amendment, a distinction which the framers of the constitution of 1890 evidently had in mind when they provided, as they have done, that the majority now required to amend the constitution must be a majority of all the qualified electors voting, whether such majority be equal to, or larger than, a majority of the qualified electors voting for members of the legislature. All the statements to be found in different decisions touching the doctrine that electors absenting themselves from an election and those present and not voting for some candidate for every office, or on every proposition submitted, are held to assent to the action of those who do not vote, are not applicable to a case like this, which is governed by a constitutional standard as to the majority necessary, expressly defined itself, that being, as stated, that the required majority shall be a majority of all the qualified electors voting at the election, for any purpose, or for any officer, as held in Stebbins' case, 108 Mich., 699. Manifestly when the constitution itself, in section 273, expressly declares that no amendment shall be adopted, except where it shall be a fact that it received, at the election, a majority of all qualified electors voting, we have a positive rule prescribed, and a fixed standard set up, and nothing short of strict compliance with the rule, or of a majority measuring up to that standard, will avail to change the organic law. There is one other important consideration, and that is, that the members of the constitutional convention of 1890 used language with the greatest precision when talking about the majority required to accomplish different ends. In section 259 it is provided: "No county seat shall be removed, unless such removal be authorized by two-thirds of the electors of the county voting therefor; but when the proposed removal shall be towards the center of the county, it may be made when a majority of the electors participating in the election shall vote therefor." Section 260 provides: "No new county shall be formed unless a majority of

the qualified electors voting in each part of the county," etc. Section 101 provides: "The seat of government of the state shall be at the city of Jackson, and shall not be removed, or re-located, without the assent of a majority of the electors of the state." It is perfectly idle to contend, in the face of all these different provisions of sections 259, 260, 101 and 273, that the members of the constitutional convention of 1890, very many of them the ablest lawyers in this or any other state, did not carefully use, with exact precision, words apt to convey the different and distinct meanings they had in view, in the adoption of these different provisions. See the forcible reasoning of the supreme court of Missouri, in *State* v. *McGowen,* 138 Mo., 193, along this line. There are other authorities which we have not thought it necessary to cite at length. There was but one election. It is a complete fallacy to argue that, because the constitutional amendments were submitted and voted on at a general election, the election was separate, and that there were two in number. There was but one election, held at the same time and place, though officers were voted for, and these amendments were voted for and against. The ballot used was a single ballot, on which was printed, along with the names of the candidates, the amendments, with directions to vote for or against them in one body.

In the case of *Bank* v. *Saunders,* 51 Nebraska, 802, it is shown that votes were deposited for and against the amendments, in boxes used in receiving ballots thus cast, all over the state; that these votes were canvassed separately, and that the whole number of votes so cast was 122,000, of which 83,000 were for and 37,000 against, speaking in round numbers, but 217,000 votes were cast for governor, and the contention was (see page 803) that it was a separate election as to the amendments. But the court held that there was but one election. That was a far stronger case for the idea that it was a separate election, than this one. Here there was no separate deposit of ballots touching the amendments, in separate boxes, and no

separate canvass of such ballots. The whole conduct of the election shows it to have been one election.

One final observation: We are not embarrassed in this case, as some of the courts whose decisions we have discussed were embarrassed, by the fact that a construction different from ours has been uniformly acted upon for a long period of time by all the departments of government and that rights have grown up under such different constructions. The governor of this state, foreseeing the evil effects to come from long delay, and the confusion which would be introduced by waiting for years, it might be, until the validity of these amendments should be otherwise presented, wisely determined to have this question settled now, in advance, finally and authoritatively, by this, the court of last resort in this state. This action saves the people of this state the very great embarrassments which would certainly have attended a delay of the settlement of this much-vexed question. This court recognizes the importance of the co-ordinate legislative department of the government. It has the highest regard for the legislature as a co-ordinate branch of the government, and for its members individually. It is one of the very ablest legislative bodies that has ever assembled in this capitol. We do not seek a jurisdiction not imposed upon us by the constitution. We could not, if we would, escape the exercise of that jurisdiction which the constitution has imposed upon us. In the particular instance in which we are now acting, our duty to know what the constitution of this state is, and, in accordance with our oaths, to support and maintain it in its integrity, imposes on us a most difficult and embarrassing duty, one which we have not sought, but one which, like all others, must be discharged when the hour comes. The action of the court below is in accordance with the views we have announced. It declared, and we now declare, that for the reasons that the said amendments were not submitted to the voters in the state in accordance with the provisions of section 273 of the constitution of 1890, and because these amendments were not

adopted at said election by a majority of all the qualified electors voting at said election, as required by said section 273, the said amendments are null and void, and form no part of the constitution, and that all the sections of the constitution which they sought to repeal, remain in full force and effect.

*Affirmed.*