| 108 | 693 |
| 111 | 566 |
| 108 | 693 |
| 112 | 101 |
| 108 | 693 |
| 128 | 554 |
| d128 | 555 |

## STEBBINS *v.* JUDGE OF SUPERIOR COURT OF GRAND RAPIDS.

BONDING PROPOSITION—MAJORITY OF VOTES—CONSTRUCTION OF CHARTER.

> Where a proposition to bond a city is submitted to the electors at a general election, under a charter providing for an issue of bonds when "the qualified electors of said city, voting in their respective wards, shall have authorized the issuing of said bonds by a majority of their votes cast at any regular election, or at a special election called for the purpose of voting upon such question," a majority of all the votes cast at the election, and not merely a majority of those cast on the bonding question, is essential to authorize the issuance of the bonds.

*Mandamus* by Charles D. Stebbins, mayor, and others, to compel Edwin A. Burlingame, judge of the superior court of Grand Rapids, to vacate a temporary injunction restraining the issuance of bonds for the purchase of a city market. Submitted March 3, 1896. Denied March 24, 1896.

By the charter of the city of Grand Rapids, the municipality is authorized to purchase, among other things, a city market, and to issue bonds therefor, under the limitation contained in the following provision:

"Nothing in this act contained shall be so construed as to authorize the incurring of any bonded indebtedness against said city of Grand Rapids for any of the purposes above specified, unless the qualified electors of said city, voting in their respective wards, shall have authorized the issuing of said bonds by a majority of their votes cast at any regular election, or at a special election called for the purpose of voting upon such question."

The common council, under the authority conferred upon it by the charter, submitted to the electors at the general election held in 1895 the question of bonding the city for $75,000, to purchase a site for a public market, and to erect and maintain market buildings thereon. Only one ballot was used, which contained the names of all the candidates and the bonding proposition. All the ballots were deposited in one box in each voting precinct. The number of electors voting at this election, as shown by the poll list, was 12,579. The total vote upon the bonding question was 7,024, of which 3,874 were for, and 3,150 against, the proposition. The common council declared the proposition carried, voted to issue the bonds, advertised them for sale, received and approved a bid. Thereupon a taxpayer filed a bill of complaint to restrain the issuing of said bonds, alleging that such issue was unauthorized; and a temporary injunction issued. The relators applied to this court for the writ of *mandamus* to compel the vacation of this restraining order.

*Henry J. Felker*, City Attorney (*Taggart, Wolcott & Ganson*, of counsel), for relators.

*Thompson & Temple* (*Taylor & Eddy*, of counsel), for respondent.

GRANT, J. (*after stating the facts*).    On account
of the public necessity for a speedy determination of
the question, we decided to hear it upon this proceeding.
It is contended on behalf of the city that a majority of the
votes cast upon the question of bonding controls; while
on the part of the respondent it is contended that the ma-
jority of all the votes cast at the election must control.

The authorities are very numerous, and are not in har-
mony.    An examination of them will show that the
phraseology of the constitutional and statutory provisions
in the various decisions differs, and the courts have had
no little trouble to determine the clear legislative intent.
The relators cite, as supporting their position, the follow-
ing authorities: *Gillespie* v. *Palmer*, 20 Wis. 544; *State*
v. *Grace*, 20 Or. 154; *State* v. *Echols*, 41 Kan. 1; *Com-
missioners of Marion Co.* v. *Winkley*, 29 Kan. 36;
*Walker* v. *Oswald*, 68 Md. 146; *Yesler* v. *Seattle*, 1
Wash. St. 310; *Sanford* v. *Prentice*, 28 Wis. 361; *Day-
ton* v. *City of St. Paul,* 22 Minn. 400; *Metcalfe* v.
*Seattle*, 1 Wash. St. 297.

*Gillespie* v. *Palmer* fully sustains the relators' con-
tention, and, if it were accepted as the law, it would
control the present case.    The soundness of that decision
was questioned in *Sawyer* v. *Insurance Co.*, 37 Wis.
524, in which it was said that it had been subjected to
the criticism that the court decided it in accordance with
the "logic of the war," rather than by the "logic of the
law."    In *Bound* v. *Railroad Co.*, 45 Wis. 579, Chief
Justice Ryan characterized it as a reproach to the court,
and a judgment proceeding upon policy rather than upon
principle.    It is expressly repudiated in *State* v. *Babcock*,
17 Neb. 194, and *State* v. *Lancaster Co.*, 6 Neb. 474,
and is criticised in other courts.    While we have great
respect for the supreme court of Wisconsin, we do not
think that that decision is supported by reason or au-
thority.

In *State* v. *Grace* the law provided that, "at the next

general election, the question of the location of a county seat shall be submitted to the legal *voters* of the county, and the place receiving the majority of all the votes cast shall be the permanent county seat." The reasoning by which.the court reached the conclusion that the majority of the votes cast upon the removal, and not of all the votes cast at the election, should control, is found at pages 161 and 162 of the report. The conclusion is based largely upon the peculiar phraseology of the statute.

In *Commissioners of Marion Co.* v. *Winkley* the statute contained no such limitation as is found in the case now before us. The statute in that case simply provided for submitting the question of a bounty to the electors at a general election. It was there provided that, "if a majority of the votes [cast] are for the bounty," the law shall be declared in force.

In *State* v. *Echols* the law required the question to be submitted to the voters of the county at a general or special election, and provided that "after said election the ballots on said question shall be canvassed in the same manner as in the election for county officers, and if the majority of all the votes cast shall be in favor of establishing such high school," etc.; and the case is decided to be ruled by *Commissioners of Marion Co.* v. *Winkley.*

In *Dayton* v. *City of St. Paul* the question arose upon a provision of the constitution relating to alterations of or amendments to it. That provision required a "*majority of the voters present and voting.*" Under this general language, a majority of those voting upon an amendment was held sufficient. It was also held in the same case that a provision similar to the one now involved required a majority of all the electors who voted at the election. The constitution provided for submitting to the electors the question of constitutional conventions, and provided that, "if a majority of all the electors

voting at said election shall have voted for a convention, the legislature shall provide for calling it." It was held that the use of language so different showed the intention to provide a different rule in each case.

In *Walker* v. *Oswald* considerable importance was attached to the provisions of the law for the canvass and return of the votes, as showing the intention to be that a majority of the electors voting upon the proposition should determine.

In *Metcalfe* v. *Seattle* the provision under which the question arose required "the assent of three-fifths of *the voters therein, voting at an election to be held for that purpose.*"

In *Yesler* v. *Seattle* the provision read: "If three-fifths of the voters of said city of Seattle shall at said election vote in favor of authorizing," etc.

These two cases adopt the definition of "voter" given by the Supreme Court of the United States in *Carroll Co.* v. *Smith*, 111 U. S. 565, as follows:

"The assent of two-thirds of the qualified voters of the county, at an election lawfully held for that purpose, to a proposed issue of municipal bonds, intended by that instrument, meant the vote of two-thirds of the qualified voters present and voting at such election in its favor, as determined by the official return of the result. The words 'qualified voters,' as used in the constitution, must be taken to mean, not those qualified and entitled to vote, but those qualified and actually voting. In that connection a voter is one who votes, not one who, although qualified to vote, does not vote."

The provision of the Constitution of Mississippi there construed reads thus:

"The legislature shall not authorize any county, city, or town to become a stockholder in, or to lend its credit to, any company, association, or corporation, unless two-thirds of the qualified voters of such county, city, or town, at a special election or regular election to be held therein, shall assent thereto."

We must hold that the above authorities are not controlling, and must look elsewhere for authority and reason on which to base our conclusion.

The first duty of courts is to examine the statute, and determine whether the intent of the legislature appears clearly therein. If it does, that is the end of the inquiry. Municipal corporations possess only those powers which are expressly conferred, or necessarily implied, in consequence of their being essential to the exercise of their proper-functions. While the same strictness is not, perhaps, required in construing statutes authorizing the issue of bonds for paving, erection of markets, and the like, as in those authorizing bonds for gifts or grants to railroads and similar purposes, still the general rule is that they must be strictly construed. The charter above quoted in plain terms requires "a majority of the qualified electors of said city voting in their respective wards." Courts are not at liberty to inject words into a statute contrary to its clear meaning, even if absurd results follow. The question of bonding municipalities is an important one, and courts have nothing to do with the reasons or results where the language is unequivocal. To say that the legislature meant that a majority of those voting at the general election on the proposition should control would be to place in the statute words and an intent not found in it. We see nothing absurd, however, in the legislature providing that at a special election a majority of the votes should control, while at a general election a majority of all the votes cast at the election should control. There might have been in the minds of the legislators the very best of reasons for such provisions.

Under the sound reason in *Dayton* v. *City of St. Paul*, *supra*, we have in this same charter an evidence of legislative intent which we cannot ignore. Section 29, tit. 3 (p. 1392, Local Acts 1893), provides for acquiring, constructing, and maintaining an electric lighting plant, if authorized by the qualified electors of said city *voting*

*thereon.* Such, also, is the language of our Constitution in submitting amendments. It requires only a majority of the voters *voting thereon.*

We think the clear weight of authority under similar provisions to the one now under consideration is in favor of the respondent. *State* v. *Foraker*, 46 Ohio St. 677; *Enyart* v. *Hanover Tp.*, 25 Ohio St. 618; *People* v. *Brown*, 11 Ill. 478; *People* v. *Wiant*, 48 Ill. 263; *State* v. *Sutterfield*, 54 Mo. 391; *Chestnutwood* v. *Hood*, 68 Ill. 132; *State* v. *Mayor of St. Louis*, 73 Mo. 435; *Cocke* v. *Gooch*, 5 Heisk. 294; *State* v. *Babcock*, 17 Neb. 188.

The rule that electors absenting themselves from the election, and those present, but not voting for some candidate for every office or on every proposition submitted, are held to assent to the action of those who do attend and vote, is not applicable to a case like the present. That rule applies only to those cases where there are no limitations, and the question is left in general terms to the determination of the electors or voters.

The injunction was properly granted, and the writ will therefore be denied.

The other Justices concurred.