KNIGHT v. SHELTON et al.

(Circuit Court, E. D. Arkansas, W. D. January 7, 1905.)

No. 5,279.

1. FEDERAL COURTS—JURISDICTION—FEDERAL QUESTION.

An action to recover damages for preventing plaintiff from exercising the right to vote for a member of Congress is one arising under the Constitution of the United States, and, where the requisite amount is involved, is within the jurisdiction of the federal court.

[Ed. Note.—Jurisdiction of federal courts in cases involving federal question, see notes to Bailey v. Mosher, 11 C. C. A. 308; Montana Ore-Purchasing Co. v. Boston & M. Consol. Copper & Silver Min. Co., 35 C. C. A. 7.]

2. CONSTITUTIONAL LAW—AMENDMENT OF STATE CONSTITUTION—SUFFICIENCY OF POPULAR VOTE.

Under Const. Ark. 1874, art. 19, § 22, which provides that proposed amendments thereto shall be submitted to the electors of the state for approval or rejection at a general election for senators and representatives, and that, "if a majority of the electors voting at such election adopt such amendments, the same shall become a part of this Constitution," the approval of a proposed amendment by a majority of the electors voting on that proposition is not sufficient for its adoption unless they also constitute a majority of all those voting at the election.

3. SAME—CONSTRUCTION OF PROVISIONS—CONTEMPORANEOUS CONSTRUCTION BY EXECUTIVE OFFICERS.

In order to entitle a contemporaneous construction of a constitutional or statutory provision by executive officers to controlling force, such provision must not only be ambiguous, and thus a proper subject for construction, but such construction must have been uniform, and within a reasonable time of the enactment of the provision.

4. FEDERAL COURTS—CONSTRUCTION OF STATE CONSTITUTION—EFFECT OF STATE DECISIONS.

Decisions of the Supreme Court of a state construing and applying an amendment to the state Constitution are not to be construed as determining its validity, or that it was legally adopted, where such question was not raised nor considered; and such decisions do not, therefore, affect the right and duty of a federal court to consider and determine such question in an action in which it is directly presented.

[Ed. Note.—State laws as rules of decision in federal courts, see notes to Wilson v. Perrin, 11 C. C. A. 71; Hill v. Hite, 29 C. C. A. 553.]

5. SAME—LEGALITY OF ADOPTION OF AMENDMENT—CONCLUSIVENESS OF DECLARATION OF CANVASSING OFFICER.

The fact that the speaker of the House of Representatives of the state of Arkansas declared a proposed amendment to the state Constitution legally adopted on the canvass of the popular vote of the election at which it was submitted is not conclusive, in the absence of any constitutional, or even statutory, provision so declaring, and it is open to a federal court, equally with a state court, to consider and determine such question when it incidentally arises in a case properly brought in such court under the laws of the United States, and which cannot be disposed of without the determination of such question.

At Law.    On demurrer to complaint.

The plaintiff in this action claims $2,500 damages from the defendants, who, as judges of the election of the Fourth Ward of the city of Little Rock, county of Pulaski, state of Arkansas, held on November 8, 1904, for the election of a member of the House of Representatives of the United States, refused to permit him to cast his vote for such member of Congress.   The complaint alleges that the plaintiff is a native-born citizen of the United States, having been born in the state of Wisconsin; that he is 36 years of age, and on said day of election was a resident of the said Fourth Ward in the city of Little Rock, county of Pulaski, state of Arkansas; that he had resided in said county and state for more than two years continuously next prior to said day of election, and in the said Fourth Ward for more than one year continuously next before said date; that by reason of these facts he was a duly qualified elector under the Constitution and laws of the state of Arkansas, and under the Constitution of the United States, entitled to vote for a member of the House of Representatives of the United States from said district and state, but that the defendants, as judges of said election, refused to permit him to cast his vote, upon the sole ground that he had not paid his poll tax for the year preceding, as required by pretended amendment No. 2 to the Constitution of the state of Arkansas.   It is then charged that said amendment is no part of the Constitution of the state, not having been adopted as prescribed by the Constitution, it being alleged that at a general election held in 1902 the

same was submitted to the people of the state for adoption, and, although more than 156,293 votes were cast at said election, only 75,740 votes were cast in favor of said amendment, which not being a majority of all the votes cast at said election, was a rejection of said amendment, and the same is no part of the Constitution of the state, although a majority of the votes cast on said amendment at the election at which it was submitted was in favor of its adoption. The present Constitution of the state of Arkansas, in force since October 30, 1874, contains the following provision as to amendments (article 19, § 22):

"Either branch of the General Assembly at a regular session thereof may propose amendments to this Constitution, and, if the same be agreed to by a majority of all the members elected to each house, such proposed amendments shall be entered on the journals with the yeas and nays, and published in at least one newspaper in each county, where a newspaper is published, for six months immediately preceding the next general election for senators and representatives, at which time the same shall be submitted to the electors of the state for approval or rejection; and if a majority of the electors voting at such election adopt such amendments the same shall become a part of this Constitution; but no more than three amendments shall be proposed or submitted at the same time. They shall be so submitted as to enable the electors to vote on each amendment separately."

Article 3 of that Constitution, as originally adopted, and which, if the contention of plaintiff that amendment No. 2 to the Constitution was never legally adopted, is still in force, prescribes the following qualifications for electors:

"Section 1. Every male citizen of the United States, or male person who has declared his intention of becoming a citizen of the same, of the age of twenty-one years, who has resided in the state twelve months, and in the county six months, and in the voting precinct or ward one month, next preceding any election, where he may propose to vote, shall be entitled to vote at all elections by the people."

Amendment No. 2 to the Constitution, which it is now claimed by plaintiff was never legally adopted, and for this reason is no part of the Constitution of the state, is as follows:

"Every male citizen of the United States, or male person who has declared his intention of becoming a citizen of the same, of the age of twenty-one years, who has resided in the state twelve months, in the county six months, and in the precinct or ward one month, next preceding any election at which he may propose to vote, except such persons as may for the commission of some felony be deprived of the right to vote by law passed by the General Assembly, and who shall exhibit a poll tax receipt or other evidence that he has paid his poll tax at the time of collecting taxes next preceding such election, shall be allowed to vote at any election in the State of Arkansas. Provided, that persons who make satisfactory proof that they have attained the age of twenty-one years since the time of assessing taxes next preceding said election and possesses the other necessary qualifications, shall be permitted to vote; and provided further, that the said tax receipt shall be so marked by dated stamp or written endorsement by the judges of election to whom it may be first presented as to prevent the holder thereof from voting more than once at any election."

The defendants, with their answer, filed a demurrer to the sufficiency of the complaint, claiming that, admitting all the allegations in the complaint to be true, the plaintiff is entitled to no relief against the defendants.

W. G. Whipple and G. W. Murphy, for plaintiff.

Rose, Hemingway & Rose and Cantrell & Loughborough, for defendants.

TRIEBER, District Judge (after stating the facts). The first question to be determined by the court is that of jurisdiction. As there is no diversity of citizenship between the parties, all of whom are citizens of the state of Arkansas, the jurisdiction of this court must be maintained upon the ground that the plaintiff's cause of action is one arising

under the Constitution or laws of the United States. Whatever doubts may have been entertained on that question at one time have been removed by the later decisions of the Supreme Court of the United States, and it must now be conceded as a settled rule of law "that the right to vote for members of the Congress of the United States is not derived merely from the Constitution and laws of the state in which they are chosen, but has its foundation in the Constitution of the United States." Ex parte Yarbrough, 110 U. S. 651, 4 Sup. Ct. 152, 28 L. Ed. 274; Wiley v. Sinkler, 179 U. S. 58, 62, 21 Sup. Ct. 17, 45 L. Ed. 84; Swafford v. Templeton, 185 U. S. 487, 493, 22 Sup. Ct. 783, 46 L. Ed. 1005. All of these cases were decided by a unanimous court. The damages claimed by the plaintiff being $2,500, this court clearly has jurisdiction, and it is its duty to determine the question raised by the demurrer—that the facts stated do not constitute a cause of action.

That, in the absence of amendment No. 2 to the Constitution of the state of Arkansas, plaintiff was lawfully entitled to vote at the election complained of is admitted by learned counsel for the defendants. The allegations in the complaint, which by the demurrer are admitted to be true, are that plaintiff possessed all the qualifications prescribed by article 3, § 1, of the Constitution; that he is a native male citizen of the United States over the age of 21 years, and has resided in the state of Arkansas for more than 12 months, in the county of Pulaski more than 6 months, and in the voting precinct where he offered to vote more than 1 month, next preceding said election. The defendants base their objection to the sufficiency of the complaint upon these grounds: First. That amendment No. 2 was legally adopted; that under the provisions of article 19, § 22, of the Constitution, regulating amendments thereto, it is not necessary, for the adoption of an amendment, that it should receive a majority of all the votes cast at such election, but it is sufficient if a majority of the votes cast on the amendment is in favor of such adoption. Second. That the amendment having been declared adopted by the speaker of the House of Representatives, it is not open to collateral attack in a proceeding in any court, and especially not in a federal court.

1. There are certain rules of law which are so well settled that it is unnecessary to refer to authorities to sustain them. Among these are the following: A Constitution can be amended only in the mode therein prescribed. The construction of constitutional provisions is governed by the same rules which apply to the construction of statutes. The language used is to be given the natural signification that the words imply, in the order and grammatical arrangement in which the framers used them, and if, thus regarded, the words convey a definite meaning which involves no absurdity, and no contradiction between parts of the same writing, then the meaning apparent upon the face of the instrument is the one which alone courts are at liberty to say was intended to be conveyed. If there is no ambiguity in the language used, there is nothing to construe, and courts must follow the letter of the Constitution. It is only when the language used is not clear or unambiguous that courts are permitted to resort to the rules of construction which govern courts in ascertaining the intent of the framers. If any of the provisions are unjust, so that their enforcement will work

a hardship to any class of persons, the remedy must come from the people who have adopted them. Construction can furnish no remedy under our system of government. By reference to the constitutional provision regulating amendments, it will be noticed that under that provision an amendment to the Constitution can only be submitted at a general election for senators and representatives, and, if a majority of the electors voting at such election adopt such amendment, the same shall become a part of this Constitution. Learned counsel for both sides have referred the court to a large number of decisions construing constitutional provisions in which the language used is quite different from that found in the Constitution of this state. In most of the Constitutions the language used is, "if a majority of the electors shall ratify the same," or "if ratified by a majority of the qualified electors," and in some states the provision is, "if ratified by a majority of those voting thereon." In many of the states those amendments may be submitted at a general or special election, as may be determined by the lawmaking power of the state. While there is some conflict among the authorities as to the construction of the phrases above quoted, this court is concluded by the decisions of the Supreme Court of the United States, and especially that of the Supreme Court of this state, that a constitutional provision merely providing that an act should be declared adopted if a majority of the electors shall ratify the same or consent thereto is fully complied with when a majority of those voting on that question vote in favor thereof. Cass County v. Johnston, 95 U. S. 360, 24 L. Ed. 416; Carroll County v. Smith, 111 U. S. 556, 4 Sup. Ct. 539, 28 L. Ed. 517; Vance v. Austell, 45 Ark. 400. But neither the Supreme Court of the United States nor the Supreme Court of this state has ever directly passed upon such a provision as is found in the Constitution of this state in relation to amendments. Careful examination of the various Constitutions of the states of the Union shows that the only states which have used language almost identical with that used by the framers of the Constitution of this state are Illinois, Ohio, Mississippi and Nebraska. In Illinois neither the diligence of counsel nor that of the court has been able to find any decision in which that constitutional provision has ever been passed upon by the Supreme Court of that state, although, as will be shown hereafter, similar provisions affecting other matters have been before that court, and the construction thereof uniform. In Nebraska, Mississippi, and Ohio the courts of last resort have passed upon this question, and the conclusions reached by each of these courts are that an amendment to the Constitution under a constitutional provision of this kind must receive not only a majority of the votes cast on the proposition to amend the Constitution, but must receive a majority of all the votes cast at the general election at which the proposed amendment was voted on. The earliest case in Nebraska was State v. Lancaster, 6 Neb. 474. The question involved there related to township organizations, and the constitutional provision required, in order to adopt such organization, a majority of all the legal voters voting at the general election at which the question was submitted. The court held that a mere majority of those voting on the subject was not sufficient unless that majority also constituted a majority of all the votes cast at such election.

It next came before that court in State v. Babcock, 17 Neb. 188, 22 N. W. 372.   In that case the question was—like the one in the case at bar—whether an· amendment to the Constitution had been adopted when there were but 51,959 votes cast for the amendment, which was a majority of the votes cast on that subject, although there were 134,-000 votes cast for Governor at that election.   Maxwell, J., in delivering the opinion of the court, says:

"The language of the Constitution would seem to require a majority of all the votes cast at that election; otherwise the words 'voting at said election' would be entirely without meaning.  The words were evidently intended as a restriction upon the right to change the fundamental law, and not permit a minority of the people of the state to incorporate new provisions therein."

The same question came again before that court in Tecumseh National Bank v. Saunders, 51 Neb. 801, 71 N. W. 779, and the same conclusion was reached in that case.

The same question came before the Supreme Court of Ohio in State v. Foraker, 46 Ohio St. 677, 23 N. E. 491, 6 L. R. A. 422.   The constitutional provision there was very much like that of this state, "If a majority of the electors voting at such election should adopt it" it should become a part of the Constitution.   There were 780,304 votes cast at the general election, and only 257,662 votes were cast in favor of the amendment, which was a majority of all the votes cast on the amendment, but 112,491 less than a majority of all the votes cast at that election.   The court, in a very elaborate opinion, in which it reviewed a large number of cases bearing on that subject, say:

"The plain meaning of this language would seem to indicate but one construction, and that is that an amendment so submitted would require for its adoption a majority of all the electors voting at the election for senators and representatives, as being the election indicated by the language 'such election.' * * * 'Such' is a pronominal adjective, and necessarily defines an 'election' previously mentioned, and the only one found in the context is an 'election for senators and representatives.' "

In Mississippi that question came before the Supreme Court in State v. Powell, 77 Miss. 545, 27 South. 927.   The Constitution of that state provides (section 273, art. 15):

"And if it shall appear that a majority of the qualified electors voting shall have voted for the proposed change, alteration or amendment, then it shall be inserted by the next succeeding Legislature as a part of the Constitution, and not otherwise."

The chief justice, who spoke for the court, delivered one of the most exhaustive and learned opinions ever written on that subject, in which a large number of the most important cases bearing on that question were thoroughly reviewed, and the conclusions reached by that court were the same as those reached by the Supreme Courts of Nebraska and Ohio.

Great stress has been laid during the argument by learned counsel for the defendants on the decision of the court in Gillespie v. Palmer, 20 Wis. 544.   That case has not only been most severely criticised by every court of last resort to which it was cited—among others those of Minnesota, Nebraska, Michigan, Indiana, Mississippi, and Ohio—but also by the Supreme Court of Wisconsin.   In Sawyer v. Insurance Company, 37 Wis. 524, that court, in referring to that case, said:

"It has been subjected to the criticism that the court decided it in accordance with the logic of the war, rather than by the logic of the law."

And in Bound v. Railway Company, 45 Wis. 543, 579, the chief justice, in dissenting from the majority of the court in the case before it, expresses the fear that the opinion of the majority in the Bound Case would "be a reproach to the court, as is Gillespie v. Palmer."

The Supreme Court of Michigan in Stebbins' Case, 108 Mich. 695, 66 N. W. 594, treats it as overruled. But, aside from that fact, that case is clearly distinguishable from the case at bar. The Constitution of Wisconsin (article 3, § 1) limited the right of suffrage to white citizens and certain Indians, but contained the following proviso:

"Provided that the Legislature may at any time extend by law the right of suffrage to persons not herein enumerated, but no such law shall be in force until the same shall have been submitted to a vote of the people at a general election and approved by a majority of all the votes cast at such election."

Article 12 of the same Constitution contained the following provision for amending that instrument. After providing how such amendment should be submitted, it says:

"And if the people shall approve and ratify such amendment or amendments by a majority of the electors voting thereon, such amendment or amendments shall become a part of the Constitution."

The court held that a majority of the votes cast in favor of the proposition to extend the franchise to persons of color, although such majority was not a majority of all the votes cast at said election, was sufficient to put such extension of the right of suffrage in force. In the opinion of the judge who delivered it for the court, as well as in the concurring opinion of the chief justice, great stress was laid on the fact that under the provisions of article 12 of the Constitution an amendment thereto only required a majority of the votes cast on that question; and as the object could have been attained by an amendment to the Constitution submitted under article 12, it was unreasonable to presume that the framers of the Constitution intended to adopt a different mode for an extension of the franchise under section 1 of article 3. On page 556 the following language is used:

"According to section 1, art. 12, of the Constitution, the Legislature may propose amendments to it, and, if they are approved by a majority of the voters voting thereon at the time prescribed by the Legislature, the amendment becomes part of the Constitution. The right of suffrage by such amendment could be given to colored persons. Is it probable that the framers of the present Constitution required more votes to extend the right of suffrage in one way than in another, and more votes to approve an act of the Legislature conferring the right when so approved than to make and approve in a law amendments to the Constitution including that conferring suffrage to colored persons? We see no reason for such a conclusion."

The chief justice, in his concurring opinion, speaking on that subject, said:

"If we look to other similar provisions of the Constitution, and especially those which elicited debate, and a careful examination of the language employed, we find this idea strictly adhered to. This is strikingly exemplified in the section which provides for submitting to the voters the question of bank or no bank. The same is also true of the provisions of submitting amendments to the Constitution, for calling a convention to revise or change it.

and some others. All of these provisions, instead of showing or tending to show, as was contended, that an actual voting majority was not to govern upon the question of the extension of suffrage, seem to me to tend very strongly, and almost irresistibly, the other way. They fixed the principle upon which the convention acted and intended to act in all such cases." Page 561.

In Missouri the Constitution required the assent of two-thirds of the qualified voters at a general election to effect a removal of a county seat. In State v. Sutterfield, 54 Mo. 392, the court held that two-thirds of the votes cast on that question, but which did not constitute two-thirds of the votes cast at that election, were insufficient. The court held: There is no doubt of the general rule that usually the result is determined by a majority of the votes actually cast where a majority is required, and that the decision of Lord Mansfield in Rex v. Forcroft, 2 Burr. 1017, is rightly followed in many cases in this country, but the decisions in England or in the other states are very unsafe guides where we are called upon to construe a constitutional provision of our own state. If the language is plain and unambiguous, its requirements cannot be set at naught upon the strength of decisions elsewhere on Constitutions essentially variant and couched in very different terms. Our Constitution does not imply an acquiescence or negative sanction or a negative assent inferred from absence, but a positive vote in the affirmative, and the number of votes is specifically named. In State v. Mayor of St. Louis, 73 Mo. 435, the Constitution provided that no amendment to the charter of St. Louis should be adopted without submission to a general or special election, and there ratified by three-fifths of the qualified voters voting thereat. In holding that this provision required, for adoption of an amendment to the charter, three-fifths of all those voting at the election, Judge Norton, who delivered the opinion of the court, said:

"The provision of the Constitution is free from ambiguity, and, giving the words employed their natural and usual signification, we think it clear that, before any amendment can be adopted, it must be accepted by three-fifths of the qualified voters voting at either a special or general election. If the framers of the Constitution intended otherwise, they would have used the word 'thereon' instead of 'thereat.'"

In State v. McGowan, 138 Mo. 187, 39 S. W. 771, the Constitution required a majority of all the voters voting at any general election to adopt a township organization. The court held that a majority of those voting on the proposition, unless they constituted a majority of all who voted at that election, was not sufficient. Barkley, C. J., in speaking for the court, said:

"The sole question before the court is the true meaning of the clause, 'whenever a majority of the legal voters of such county voting at any general election shall so determine.' But the majority required must be a majority of the legal voters voting at any general election, just as the Constitution declares. We must ascertain whether the Constitution is to be taken to mean exactly what it says on the point of present controversy, or to be taken with the shade of meaning proposed in the able argument for relators."

The court then compares the different parts of the Constitution relating to elections, and adduces a conclusion therefrom in favor of the construction urged by the plaintiff in the case at bar.

In Bayard v. Klinge, 16 Minn. 249 (Gil. 221), it was held:

"Where the Constitution provides that a majority of those voting at a general election shall be required to remove a county seat, it is not in the power of the Legislature to alter the rule, and direct that a majority voting on the question shall be sufficient."

To the same effect is Everett v. Smith, 22 Minn. 53.

In People v. Berkeley, 102 Cal. 298, 36 Pac. 591, 23 L. R. A. 838, the constitutional provision before the court was:

"Towns might be organized under general laws whenever a majority of the electors voting at a general election should so determine."

The court held that the annual election provided by law for the election of municipal officers was a general election, as there are only two classes of elections, and this was not a special election. The court then proceeded to say:

"The words of the Constitution clearly do not intend that only a majority of the electors voting upon the proposition is necessary, but would seem to imply that a majority of all those voting at the election is required. A majority of all the electors voting at the election is necessary to carry the proposition to organize."

In Stebbins v. Superior Court, 108 Mich. 693, 66 N. W. 594, a statute of the state authorized the city of Grand Rapids to issue bonds, "if authorized by a majority of the qualified electors at a regular or special election called for that purpose," and it was held that, the matter having been submitted at a general election, it required a majority of all who voted at that election. Merely a majority of those voting on the question was held to be insufficient.

In Belknap v. Louisville, 99 Ky. 475, 36 S. W. 1118, 34 L. R. A. 256, 59 Am. St. Rep. 478, the Constitution required the assent of two-thirds of the voters voting at an election to be held for that purpose for the issuing of city bonds. The court, in determining the matter, said:

"Not only is a much larger vote usually brought out on the occasion of a general election, but the people at large are usually better informed of the matters upon which they are entitled to vote by reason of the greater interest and fuller discussion had. * * * There could be but one election a year except in the cases especially provided for. The question was to be submitted to the people at that election. It was one election, though held for the several purposes, and was in no sense a collection of elections held on the same day. * * * Assent implies action, and is not merely a failure to dissent. The words 'qualified voters,' as used in the Constitution, must be taken to mean those qualified and actually voting. To give a different construction would involve an inquiry whether there were other voters who had from any cause abstained from voting, and this would lead to interminable inquiry, and invite contests which would be embarrassing and baneful." (Quoting the above from the decision of the Supreme Court in Carroll County v. Smith, 111 U. S. 556, 4 Sup. Ct. 539, 28 L. Ed. 517.)

The court then proceeds:

"But we are met with a very different question when the question is required to be submitted at a general election, and is one of the purposes for which that election is held. It is then required to receive the assent of two-thirds of the voters of the city voting at that election."

In People v. Warfield, 20 Ill. 160, where a constitutional provision provided that to remove a county seat required a majority of the voters of the county, it was held that, to give this provision of the Constitu-

tion practical operation, we must presume that it was the intention of the framers of that instrument that the voters would all vote, and that the majority of those voting should determine the question. The reason for this presumption is stated by the court to be that:

> "To give it a different construction would involve an inquiry whether there were other voters of the county who had from any cause abstained from voting, and this would lead to interminable inquiry and invite contests in such elections which would be embarrassing and baneful, if it did not destroy all the practical benefits of laws passed under the provisions of the Constitution."

In that case there was no other vote taken at that election except upon the question of removal of the county seat, and that vote was adopted as the means of ascertaining the number of legal voters of the county.

In People v. Wiant, 48 Ill. 263, the construction of the same constitutional provision was before the court, with this difference: that at that election the electors also voted for a circuit judge, and the returns of the election showed the number of votes cast for removal, although a majority of those who voted on that question did not constitute a majority of all the votes cast at that election, and this was held insufficient. The court in that case say:

> "It is not the votes cast upon that single question that is to govern where it occurs at any other election held at the same time, for it must appear that a majority of all the votes cast at that election were in favor of removal. When there is no other election held at that time, the returns of the officers of the votes on that question will govern"—distinguishing People v. Warfield, supra.

The same conclusion was reached by that court in Chestnutwood v. Hood, 68 Ill. 132.

Without stating the facts of each case, it is sufficient to say that the courts construing statutes or constitutional provisions requiring a majority of the votes cast at the election have almost unanimously held that it required a majority of all the voters who participated at that election, and not merely a majority of those who voted on the particular question submitted. In Re County Seat of Linn County, 15 Kan. 500, the court held that under a provision requiring a majority of the electors of the county to justify a removal of the county seat it was sufficient if a majority of the votes cast at the special election held for that purpose was in favor of the removal; but Judge Brewer, now one of the Justices of the Supreme Court of the United States, who delivered the opinion of the court, was careful to distinguish between special and general elections. In his opinion he says:

> "As these county seat elections cannot be held on the days of general elections, these considerations do not apply to cases where two or more questions are submitted at the same election, and more votes are cast upon one question than upon another, for there the biggest number of votes cast upon any one question is clear evidence of the number of voters which may not, in view of any such constitutional restriction above quoted, be disregarded in any contest arising as to the decision of other questions. Nor, perhaps, do they apply to cases where two elections are held so near together in time that the courts may fairly say that the difference between the number of votes cast upon the two elections cannot reasonably be accounted for upon the theory of a change in the number of electors."

In Green v. State Board of Canvassers, 5 Idaho, 130, 47 Pac. 259, 95 Am. St. Rep. 169, the court was called upon to determine whether an amendment to the Constitution had been adopted. The Constitution provided (article 20, § 1):

"And if a majority of the electors shall ratify the same, such amendment or amendments shall become a part of the Constituion."

Section 3 of the same article referred to the calling of a convention for the purpose of framing a new Constitution, and, after providing for a submission thereof at the next general election, proceeded:

"And if a majority of all the electors voting at said election shall have voted for a convention, the Legislature shall at the next session provide by law for calling the same."

The amendment having received a majority of the votes cast on that question, but not a majority of all the votes cast at the election, the court was called upon to determine whether it had been adopted or not, and the court, in holding that it was adopted, said:

"We confess ourselves unable to appreciate the argument which would make the language of section 1 of article 20 and section 3 of said article synonymous, or expressive of the same intention. If they were, as counsel for the defendants contend, intended to mean the same thing, why was not the same language used? We know of no rule of construction, nor has our attention been called to any, that would warrant us in arbitrarily saying that the language used in the two sections was intended to mean the same thing. On the contrary, the reason seems to us to be the other way."

The same conclusions were reached by the Supreme Court of Oregon in State v. Grace, 20 Or. 154, 25 Pac. 382, and the Court of Appeals of Maryland in Walker v. Oswald, 68 Md. 146, 11 Atl. 711.

The principal cases cited and relied on by counsel for the defendants are: Cass County v. Johnston, 95 U. S. 360, 24 L. Ed. 416, Carroll County v. Smith, 111 U. S. 556, 4 Sup. Ct. 539, 28 L. Ed. 517, and cases construing constitutional or statutory provisions similar to those construed by the court in those cases and by the Supreme Court of this state in Vance v. Austell, 45 Ark. 400. As those provisions are entirely different from the one now under consideration, these authorities are inapplicable, and cannot control the decision herein.

Learned counsel for the defendants have ably argued that contemporaneous construction of a constitutional or statutory provision is entitled to the highest consideration, and should practically be controlling. It is true that contemporaneous construction is of the greatest importance in determining the construction of an act, provided the language used is subject to more than one construction. If there is no ambiguity in the language used, there is nothing to construe, as stated at the beginning of this opinion. But, even if there be some ambiguity, in order to influence courts by contemporaneous construction, that construction must have been uniform, and within a reasonable time of the enactment of the provision thus construed. Cooley on Con. Lim. (5th Ed.) p. 67. As stated by that learned author:

"A constitution is not to be made to mean one thing at one time and another at some subsequent time, when the circumstances may have so changed as, perhaps, to make a different rule in the case seem desirable."

In Swift Co. v. United States, 105 U. S. 691, 695, 26 L. Ed. 1108, Mr. Justice Matthews said:

"The rule which gives determining weight to contemporaneous construction put upon a statute by those charged with its execution applies only in cases of ambiguity and doubt"; citing numerous cases to sustain that rule.

In United States v. Graham, 110 U. S. 219, 221, 3 Sup. Ct. 582, 28 L. Ed. 126, Chief Justice Waite thus stated the law:

"Such being the case, it matters not what the practice of the departments may have been, or how long continued, for it can only be resorted to in aid of interpretation, and it is not allowable to interpret what has no need of interpretation. If there were ambiguity or doubt, then such a practice, begun so early and continued so long, would be in the highest degree persuasive, if not absolutely controlling, in its effect. But with language clear and precise, and with its meaning evident, there is no room for construction, and consequently no need of anything to give it aid."

In United States v. Tanner, 147 U. S. 661, 663, 13 Sup. Ct. 436, 37 L. Ed. 321, it was said by Mr. Justice Brown:

"If it were a question of doubt, the construction given to this clause prior to October, 1885, might be decisive; but, as it is clear to us that this construction was erroneous, we think it is not too late to overrule it. * * * It is only in cases of doubt that the construction given to an act by the department charged with the duty of enforcing it becomes material."

In United States v. Alger, 152 U. S. 384, 397, 14 Sup. Ct. 635, 38 L. Ed. 488, Mr. Justice Gray used this language:

"If the meaning of that act were doubtful, its practical construction by the Navy Department would be entitled to great weight. But as the meaning of the statute, as applied to these cases, appears to this court to be perfectly clear, no practice inconsistent with that meaning can have any effect."

In Webster v. Luther, 163 U. S. 331, 342, 16 Sup. Ct. 963, 967, 41 L. Ed. 179, Mr. Justice Harlan stated the rule in these words:

"The practical construction given to an act of Congress, fairly susceptible of different constructions, by one of the executive departments of the government, is always entitled to the highest respect, and in doubtful cases should be followed by the courts, especially when important interests have grown up under the practice adopted. * * * But this court has often said that it will not permit the practice of an executive department to defeat the obvious purpose of a statute."

In Fairbank v. United States, 181 U. S. 283, 311, 21 Sup. Ct. 648, 959, 45 L. Ed. 862, Mr. Justice Brewer said:

"We have no disposition to belittle the significance of this matter [meaning contemporaneous construction]. It is always entitled to careful consideration, and in doubtful cases will, as we have shown, often turn the scale; but when the meaning and scope of a constitutional provision are clear it cannot be overthrown by legislative action, although several times repeated, and never before challenged."

In the last-cited case the question involved was the constitutionality of an act of Congress, and the contemporaneous construction insisted on was several acts of Congress.

Counsel for defendants, in order to establish contemporaneous construction in favor of their view, refer to the facts that the speaker of the House of Representatives had declared this and another amendment open to the same objection to have been properly ratified; that the Legislature, in amending the election laws of the state at its session

of 1893 (the same session at which this amendment was declared adopted), recognized it as having been legally ratified at the preceding election; that the Governor of the state has, under another amendment to the Constitution, declared to have been adopted under the same conditions as amendment No. 2, filled many vacancies in offices; and that the Supreme Court of the state has in two cases recognized the validity of these two amendments. So far as the construction by the legislative and executive departments is concerned, it can hardly be claimed that such construction has been uniform. The first time this constitutional provision came before these two departments of the state for construction was in 1880—only six years after the adoption of the Constitution. In 1879 the General Assembly of the state submitted to the people the amendment generally known as the "First Fishback Amendment." This was voted on by the people at the general election held in 1880, and of the votes cast on that amendment a large majority was in its favor, but it failed to receive a majority of all the votes cast at that election. At that time the returns of elections on amendments were by statute required to be made to and canvassed by a state board composed of the Governor, Attorney General, and Secretary of State. That board, after giving the matter the most careful consideration, unanimously held that the amendment had not been ratified. This view of the board was approved by the leading jurists of the state, many of them prominent members of the convention which framed the Constitution. Hon. A. H. Garland, the first Governor of the state under this Constitution, then one of the United States Senators from this state, and later Attorney General of the United States, who was generally recognized as one of the greatest constitutional lawyers not only of this state, but of the nation, published a very able opinion on that subject, holding that under that provision of the Constitution a majority of all the electors voting at that election was necessary to secure the adoption of an amendment. This construction was acquiesced in by all parties and departments of the state, and in 1883 the General Assembly resubmitted the same amendment to the people, and, having been at the general election held in 1884 approved by a majority of all the electors voting at that election, it was declared duly ratified. When the General Assembly in 1891 amended the statutes regulating the submission and adoption of amendments, it used the following language:

"If it shall appear that a majority of the electors voting at such election adopted such amendment, then," etc. Section 718, Kirby's Digest.

At the same session the statute regulating to whom the returns of the votes cast on an amendment were to be sent was changed so as to require them to be made to the speaker of the House of Representatives. That act provided:

"When all the returns have been received by the Secretary of State said secretary shall keep such returns in the original envelopes with the seals unbroken until the General Assembly shall convene, when he shall send such returns to the speaker of the House of Representatives at the same time and in the same manner as is now provided by law for sending in the election returns for Governor and other state officers, and said returns shall be opened and counted in the presence of the General Assembly in joint convention assembled." Section 717, Kirby's Digest.

"The manner provided by law for sending in the election returns for Governor and other state officers" mentioned in the above section was regulated by section 3, art. 6, of the Constitution, and the act of 1875 (Acts 1874–75, p. 104), digested as section 2852, Kirby's Digest, and is as follows:

"The speaker of the House of Representatives, during the first week of the session after each election for Governor, Secretary of State, Treasurer of State, Auditor of State and Attorney-General, shall, in the presence of both houses of the General Assembly, open and publish the votes cast and given for each of the respective officers hereinbefore mentioned. The person having the highest number of votes for each of the respective offices shall be declared duly elected thereto; but if two or more shall be equal and highest in votes for the same office, one of them shall be chosen by a joint vote of both houses of the General Assembly, and a majority of all the members elected shall be necessary to a choice. The president of the Senate and the speaker of the House of Representatives shall make and deposit in the office of the Secretary of State a certificate declaring what persons have been elected to any offices named."

What was the object of the Legislature in requiring the returns on proposed amendments to the Constitution to be sent to the speaker? There could have been but one. As the speaker would at that time and place have before him the returns of the election for the principal officers of the state, he could easily determine whether the votes cast in favor of an amendment were a majority of all the votes cast at said election. All the returns were before him and the two houses of the General Assembly, and it was a simple matter of calculation to determine the result.

Reference to the journal of the House (page 146) will show that the joint session for that purpose was held on January 12, 1893; that from the returns made and before that body it appeared that 75,940 votes were cast for amendment No. 2 and 56,601 votes against it; that there were cast at that same election for Governor 156,292 votes, for Secretary of State 155,996 votes, for Auditor 154,604 votes, for Treasurer 155,335 votes, and for Attorney General 156,293 votes. It is true that amendment No. 3, which was declared adopted in 1895, has been acquiesced in by the Governor of the state, who has uniformly filled all vacancies in offices as they occurred by virtue of the provisions of that amendment. But it is also a well-known fact that the Attorney General of the state, the only member of the executive department of the state required to be learned in the law, has uniformly held that these amendments were not legally adopted, and were no part of the Constitution. Thus we find that the only Attorneys General of the state— the one filling the office in 1880 and the one in office for the last four years—who have been called upon to construe or to determine that question officially have reached conclusions different from those acted on by some of the speakers of the House of Representatives and some of the Governors. Does that show a uniform construction?

The declarations in favor of the validity of these amendments alleged to have been made by the Supreme Court are claimed to be found in the opinions of that court in Dunn v. Lott, 67 Ark. 591, 58 S. W. 375, and Childers v. Duvall, 69 Ark. 336, 63 S. W. 802; the first case confirming, it is claimed, the validity of amendment No. 2, and the last case that of amendment No. 3. But neither the reports of

these cases nor the original records thereof, including the briefs of counsel, which the court has carefully examined, show that these questions were either raised, argued by counsel, or in any manner, directly or indirectly, brought to the attention of the court in either of the cases. Under such circumstances, to contend that these cases are decisions of the court on that subject is against all reason, and without any authority. The rule of stare decisis has been often before the courts, and none of them has ever carried it to the extent now claimed by counsel for the defendants. The court knows of no clearer expression on that subject than that delivered by the Supreme Court of the United States in Boyd v. Alabama, 94 U. S. 645, 648, 24 L. Ed. 302. Mr. Justice Field, who delivered the unanimous opinion of the court in that case, says:

"It is true that in a former case against the same defendant upon an indictment of a similar kind, for a previous offense of setting up and carrying on a lottery, the Supreme Court of the state held that the statute in question constituted a contract, and that the repealing act was for that reason void. But in that case the only subject before the court was the meaning of the statute—whether its provisions in their terms amounted to a contract which a subsequent enactment could not impair. The constitutionality of the act was not drawn in question. That was not denied. Courts seldom undertake in any case to pass upon the validity of legislation where the question is not made by the parties. Their habit is to meet questions of that kind when they are raised, but not to anticipate them. Until then they will construe the acts presented for consideration, define their meaning, and enforce their provisions. The facts that acts may in this way have been often before the court is never deemed a reason for not subsequently considering their validity when that question is presented. Previous adjudications upon other points do not operate as an estoppel against the parties in new cases, nor conclude the court upon the constitutionality of the act, because that point might have been raised and determined in the first instance."

It will be noticed that in that case the action was between the same parties, involving the same act.

This court, while it would unhesitatingly follow any construction of a statute or constitutional provision of the state made by the Supreme Court of this state, not only owing to the high regard it has for the learning and ability of every one of its members, but for the further reason that the construction of a state constitution or statute by the highest court of that state is absolutely conclusive upon the federal judiciary, has no hesitation in expressing the opinion that in neither of these cases did that court pass upon the question involved in this cause, and for this reason these decisions are neither binding on this court nor precedents for any other court.

Even were the constitutional provision now under consideration less clear than it is, a careful examination of the entire instrument and the provision on that subject in the Constitution in force prior thereto would remove any doubt on the subject. Comparing the various clauses in that instrument on the subject of elections and majorities required, it will clearly appear that the framers thereof intended to establish a different rule for different elections. Referring to the Constitution in force at that time—that of 1868—we find the following language used in relation to amendments:

"And if the people shall approve and ratify such amendment or amendments by a majority of the electors qualified to vote for members of the General As-

sembly voting thereon, such amendment or amendments shall become a part of the Constitution of this state." Article 13, § 1.

If the intention of the framers of the present Constitution had been to require only a majority of those voting thereon in order to amend the Constitution, how natural it would have been to use the same language found in the Constitution then in force. The majority of that convention was composed of some of the ablest lawyers in the state, men who were thoroughly familiar with every provision of the Constitution which was about to be replaced; and when they saw proper to change the wording of that particular article it is but reasonable to suppose that it was done for a purpose. Referring to the present Constitution, we find article 6, § 3, provides that the persons receiving the highest number of votes for Governor and other officers shall be declared elected. Here only a plurality is required. Article 6, § 3, provides that in case of tie an election shall be by joint vote of both houses, and "a majority of all the members elected" shall be necessary to a choice. Here the criterion is the majority of all the members elected to the two houses of the General Assembly, and not merely a majority of those members who see proper to vote on that subject. Article 13, § 3, provides that county seats shall not be established or changed without the consent of "a majority of the qualified voters of the county" to be affected by such change. Here the criterion is a majority of all the qualified voters of the county, and this had been construed at that time by Lord Mansfield and many of the courts of the different states of the Union to mean a majority of the votes actually cast thereon. Article 15, § 2, provides that no person shall be convicted upon impeachment without the concurrence of two-thirds of the members of the Senate. Section 17 of the schedule prescribes that, to ratify the Constitution, when submitted to the people for that purpose, a majority of all votes cast must be in favor thereof.

The framers of the Constitution evidently did not believe that there should be frequent amendments to the Constitution. They thought that, before any changes should be made, there should be a full opportunity given to the people to inform themselves fully on the subject, and for this reason they required that amendments should only be voted on at a general election when all state, county, and township officers are elected, and the people generally participate in them. They thought that it would be best to require the positive assent of a majority of those who voted at the election, and not merely a negative consent.

As it is admitted, and is conclusively shown by the official journals of the House, that amendment No. 2 did not receive a majority of all the votes cast at the election at which it was submitted to the people, it failed to become a part of the Constitution of the state within the meaning of article 19, § 22.

2. Is the fact that the speaker of the House of Representatives declared that the amendment was duly ratified conclusive, and not subject to an attack in an action of this kind; and, if subject to collateral attack, can it be made in a federal court? The only cases relied upon as to the first part of the proposition by learned counsel for the defendants was Knox County v. Aspinwall, 21 How. 539, 16 L. Ed. 208, and

the cases following the rule there established that, where municipal bonds negotiable under the law merchant are authorized to be issued upon a majority vote of the electors, the decision of the commissioners that this condition has been complied with is conclusive after the rights of innocent holders have attached. The court is somewhat at a loss to understand how the law merchant, or any other law governing negotiable instruments, can be applied to a question of this kind. No cases have been cited in which it has ever been held that, in the absence of a provision in the Constitution making some board or tribunal the sole judge to determine the adoption of an amendment to the Constitution, the declaration of the officer or board designated by law to canvass the vote is conclusive, and not subject to review in a court of justice. It may be conceded that the Constitution may provide for some tribunal whose determination of that question shall be conclusive, but the framers of the Constitution of this state have not seen proper to vest in any person or board such powers. This matter was left solely to the wisdom of the General Assembly. The only elections the returns of which the Constitution requires to be made to the speaker of the House and contests thereon determined by the Legislature are those for Governor, Secretary of State, Treasurer of State, Auditor of State, and Attorney General. The election returns for these officers are required to be made to the speaker of the House, and by him canvassed and the result declared at a joint session of both houses of the General Assembly. Article 6, §§ 3, 4, Const.

In 1879—the session of the General Assembly at which the first amendment to the Constitution of 1874 was proposed—an act was passed to regulate the mode or proposing and voting upon amendments to the Constitution. Acts 1879, p. 128. By the provisions of that act (section 11) the Governor, Attorney General, and Secretary of State were constituted as a board of canvassers to ascertain the result. In 1883 this act was amended, and the speaker of the House of Representatives designated as the person to canvass the vote on amendments. Acts 1883, p. 70. In neither of these acts did the Legislature attempt to make the decision of the canvassing board conclusive, and for this reason it is unnecessary to determine whether it possessed such power, which, in view of the fact that the Constitution established three departments—the legislative, executive, and judicial—and vested all judicial powers in the judicial department except jurisdiction to determine contests for certain state officers hereinbefore mentioned, is at least doubtful. To hold, in the absence of any express provision in the Constitution depriving the judicial department of the state of any of the functions which naturally belong to that department, that the Legislature could take away that power would be violative of the spirit which pervades not only the Constitution of this state, but that of every other state of this Union. It would, in effect, make that department an inferior, and not a co-ordinate, branch of the government. The independence of the courts in unhesitatingly declaring acts in conflict with the Constitution void, and thus reviewing the acts of the legislative department of the state, has done more to preserve the blessings of liberty which we now enjoy than any other act of any department of the government.

The numerous cases hereinbefore cited, and many others in which the courts were called upon to determine the question whether an amendment to the constitution had been legally adopted or not, but which are not cited in this opinion because the provisions of the constitutions under which they were submitted were different from those of this state, and therefore inapplicable, show that there are but few courts of last resort in the Union who have not at some time or other assumed jurisdiction to determine that question. One of the ablest cases in which that question is directly determined, and in which a large number of the authorities are reviewed, is State v. Powell, 77 Miss. 545, 27 South. 927. Many other authorities on that question will be found collated in 6 Am. & Eng. Ency. (2d Ed.) 908. To cite all of these cases in this opinion would merely add to the length of it, and the court feels that it is lengthy enough. The only excuse for this is the importance of the questions involved. .

It may be proper in this connection to refer to the fact that in Eason v. State, 11 Ark. 481, the Supreme Court of this state did not hesitate to declare an amendment to the Constitution void upon the ground that the bill of rights could not be amended. Are federal courts precluded from passing upon such a question when it incidentally arises in a case pending therein, which cannot be disposed of without determining it? Merely to state the proposition is to answer it. The acts of Congress enacted under the powers granted to that body by the Constitution of the United States have conferred upon federal courts jurisdiction in certain causes concurrent with the courts of the states. Every citizen coming within these acts of Congress is guarantied by the Constitution of the United States the privilege of selecting that forum in preference to any other, if he so desires. Any act of a state seeking to deprive any one of that right is absolutely null and void, as being in conflict with the national Constitution. Home Insurance Co. v. Morse, 20 Wall. 445, 22 L. Ed. 365; Kern v. Huidekoper, 103 U. S. 485, 26 L. Ed. 354; Martin v. Railway Co., 151 U. S. 673, 14 Sup. Ct. 533, 38 L. Ed. 311; Goldey v. Morning News, 156 U. S. 518, 15 Sup. Ct. 559, 39 L. Ed. 517. A citizen thus invoking the jurisdiction of a federal court has a right to demand that every legal question at issue in that cause, and which might have been determined if the action had been instituted in a state court, should be decided by the federal court. But, if the contention of the learned counsel for the defendants is correct, this court will find itself powerless to determine this cause, be cause indirectly the question whether an amendment to the Constitution has been adopted in conformity with the Constitution of the state has been raised by the pleadings of the parties, although under the law it has jurisdiction of the parties as well as of the subject-matter. Luther v. Borden, 7 How. 1, 12 L. Ed. 581, is the principal case relied upon to maintain this proposition, but the facts in that case are quite different from those involved in the case at bar. That cause grew out of the Dorr rebellion in Rhode Island. There were two conflicting governments in that state, each claiming to be the lawful government. One of them succeeded, and became the only established government, having absolute control of every department of the state, executive, legislative, and judicial. The senators and representatives in Congress

were elected by the Legislature of that government and recognized by Congress. The court held that upon that state of facts the courts would follow the decisions of the political department. No such facts are before the court in the case at bar. There are no dual governments in this state. No department authorized by the Constitution of the state to decide this question has ever determined it, and, if this court now declines to pass upon it, would it not deprive the plaintiff of a privilege, granted to him by the Constitution of the United States, to make his own selection in what tribunal he wants his rights, claimed to arise under the Constitution of the United States, determined? In Smith v. Good (C. C.) 34 Fed. 204, the court did hold that a federal court has no power to pass upon a question of this kind, but the reasoning of the learned judge is not convincing, nor do the authorities cited by him sustain his conclusion. With the highest regard for the learned judge who decided that case, this court is unable to follow that decision.

The demurrer to the complaint will be overruled.